SHOWPIECE HOMES CORPORATION,
Joy L. McMillan, and Edward J.
McMillan, Plaintiffs,

v.

ASSURANCE COMPANY OF
AMERICA, Defendant.

No. 00SA212.

Supreme Court of Colorado,
En Banc.

Dec. 17, 2001.

As Modified on Denial of Rehearing
Jan. 11, 2002.

Bieging Shapiro & Burrus LLP, Steven B. Shapiro, M. Gabriel McFarland, Denver, CO, Attorneys for Petitioners.

Spies, Powers & Robinson P.C., Brendan O. Powers, Jack D. Robinson, Denver, CO, Attorneys for Respondents.

Ken Salazar, Attorney General, Garth C. Lucero, Senior Counsel, Denver, CO, Amicus Curiae for Colorado Attorney General.

Roberts Levin Zboyan & Patterson P.C., Thomas L. Roberts, Bradley A. Levin, Michael J. Carrigan, Denver, CO, Amicus Curiae for the Colorado Trial Lawyers Association.

Campbell, Latiolais & Ruebel, P.C., Jeffrey Clay Ruebel, Denver, CO, Amicus Curiae for Colorado Defense Lawyers Association.

Justice MARTINEZ delivered the Opinion of the Court.

Pursuant to C.A.R. 21.1, we agreed to answer several questions certified to us by the United States District Court for the District of Colorado. The questions arise out of a civil action currently pending in the United States District Court in which an insurance company, Assurance Company of America (Assurance), moved to dismiss the Colorado Consumer Protection Act (CCPA) claims of plaintiff, Showpiece Homes Corporation, Joy McMillan, and Edward McMillan (collectively, Showpiece).

The underlying facts are as follows. Showpiece was subjected to a settlement demand in an action by a party not involved in the present action. Showpiece alleged that Assurance failed to authorize sufficient funds to meet the settlement demand, as well as failed to properly investigate and promptly settle the claims against Showpiece. The improper investigation and settlement practices asserted by Showpiece allegedly violate the CCPA. Central to the contested issues before the United States District Court is

whether the insurance industry is excluded from the provisions of the CCPA, or whether insureds may bring claims against insurers through a private cause of action.

The first certified question asks whether a private cause of action by an insured against an insurer is preempted by the Colorado Unfair Claims—Deceptive Practices Act (UCDPA), codified at sections 10–3–1101 to –1114, 3 C.R.S. (2001). If no such preemption exists, the second question asks whether section 6–1–106, 2 C.R.S. (2001), excludes the insurance industry from provisions of the CCPA. The third question asks whether insurance encompasses the sale of goods, services, or property under the CCPA. Finally, the fourth question asks whether the CCPA applies to an insurer's post-sale unfair or bad faith conduct.

We conclude that a private cause of action by an insured under the CCPA is not preempted by the UCDPA. The CCPA is meant to work in tandem with other regulatory provisions in the Colorado statutes, and as such, works in conjunction with, not to the exclusion of, the UCDPA. We also conclude that the insurance industry is not excluded from the provisions of the CCPA and that insurance falls under the category of sale of goods, services, or property under the CCPA. Finally, we conclude that the CCPA applies to an insurer's post-sale or bad faith conduct and unfair claims handling practices. Therefore, we answer the first two questions in the negative, and the third and fourth questions in the affirmative.

I.

Showpiece purchased a one-year term commercial general liability insurance policy (CGL) from Assurance for a term beginning February 17, 1993, and ending February 17, 1994.[1] Showpiece renewed the insurance policy twice for additional terms of one year

---

1. The facts presented here are taken from Showpiece's amended complaint, which is attached to the Federal District Court's order for certification of questions of law. *See* C.A.R. 21.1(c)(2)(certification order shall set forth "[a] statement of all facts relevant to the questions certified and showing fully the nature of the

controversy in which the questions arose"); *Garman v. Conoco, Inc.,* 886 P.2d 652, 661 (Colo.1994)(Erickson, J., concurring)("Our answer to the certified question should be limited by the record and the question of law certified for determination.").

each. Joy McMillan and Edward McMillan are shareholders and officers of Showpiece who are insured under the Assurance CGL policies, and who are intended third-party beneficiaries of the CGL policies. Showpiece paid in full the premiums of each CGL policy. The CGL policies require Assurance to defend and indemnify Showpiece for covered claims, loss, or damage up to a limit of $500,000 per occurrence.

In May 1998, Barry Tillis and Marlene Cohn (collectively, the Tillises)[2] commenced litigation against Showpiece, claiming damages caused by the settlement of the soils at the Tillises' residence. Showpiece alleges that the settlement of the soils at the Tillises' residence constitutes an "occurrence" as defined in the Assurance CGL policies. Showpiece further alleges that the settlement of the soils constitutes a progressive and continuous process that has occurred during the term of at least one of the Assurance CGL policies. Prior to the commencement of the Tillises' action, the Tillises made a demand upon Showpiece for payment of $190,000 as compensation for the damages caused by the settlement of soils. Showpiece notified Assurance of the demand and requested benefits under the CGL policies to pay and settle. Assurance declined authorization to pay and settle the demand.

Despite Showpiece's advisement that the Tillises would seek legal action if the settlement was not paid, Assurance continued to decline funds to pay the Tillises. After commencing litigation, the Tillises later made a further demand on Showpiece for a total of $500,000. Though this demand was still within the coverage limit of the CGL policies, Assurance continued to refuse authorization to pay. After the insurance company for a co-defendant paid $280,000 to the Tillises for their demand on that other party, Assurance authorized a payment of $191,000 in satisfaction of the Tillises $500,000 demand. The Tillises later increased their demand to $800,000. Assurance still refused to pay more than $191,000 despite advisement from defense counsel, retained by Assurance to represent Showpiece, to authorize a single policy limit of $500,000. Further, in an effort

to entice Assurance to authorize payment, the insurance company for the co-defendant authorized $360,000 for the settlement of funds and the insured parties committed to payment of $80,000.

Assurance declined to contribute the remaining $360,000 without imposing allegedly unconscionable conditions upon Showpiece. In the alternative, Assurance communicated that it would pay $191,000 only if Assurance were released from all future liability for the Tillises' claims. Finding such an offer unreasonable, Showpiece rejected Assurance's contribution and paid approximately $440,000 toward the Tillises' claim. Showpiece then brought an action in the United States District Court for settlement of its claims under the CCPA. Assurance moved to dismiss based on the grounds that the UCDPA preempted claims against insurance carriers under the CCPA, and that the insurance industry is exempted from the CCPA. The United States District Court, upon Showpiece's motion to seek certification of those questions, ordered the questions for certification of law pursuant to C.A.R. 21.1. By our order dated June 22, 2000, we accepted the following questions as framed by the United States District Court:

(1) Whether a private cause of action by an insured against an insurer under the Colorado Consumer Protection Act, § 6–1–101 et seq., C.R.S., ("CCPA") is preempted by the Colorado Unfair Claims—Deceptive Practices Act ("UCDPA"), codified at § 10–3–1101 et seq., C.R.S.

(2) Whether the insurance industry is excluded from the provisions of the CCPA by § 6–1–106, C.R.S.

(3) Whether insurance encompasses the sale of goods, services, or property under the CCPA.

(4) Whether the CCPA applies to an insurer's post-sale unfair or bad faith conduct.

We now address each of those questions.

II.

A.

The CCPA is a remedial statute intended to deter and punish deceptive trade

---

2. Because Barry Tillis and Marlene Cohn are referred to collectively as the "Tillises" in Showpiece's amended complaint, for purposes of con-

sistency and clarity, we will also refer to them as such.

practices committed by businesses in dealing with the public. *See People ex rel. Dunbar v. Gym of Am., Inc.,* 177 Colo. 97, 112–13, 493 P.2d 660, 667–68 (1972); *People ex rel. MacFarlane v. Alpert Corp.,* 660 P.2d 1295, 1297 (Colo.App.1983). The CCPA's broad legislative purpose is "to provide prompt, economical, and readily available remedies against consumer fraud." *Western Food Plan, Inc. v. Dist. Court,* 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979). This purpose is achieved through injunctions and civil penalties such as treble damages and attorney's fees. *See* §§ 6–1–107 to –112 & –113(2), 2 C.R.S. (2001). The availability of treble damages and attorney's fees is also intended to promote private enforcement of the CCPA. *See Lexton–Ancira Real Estate Fund, 1972 v. Heller,* 826 P.2d 819, 822 (Colo. 1992). The statute thus provides both for enforcement by the attorney general and a private right of action to any person injured by the deceptive acts or practices committed by a business.

■ The UCDPA regulates unfair or deceptive trade practices in the insurance industry. The legislative purpose of the UCDPA is

> to regulate trade practices in the business of insurance by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices, and by prohibiting the trade practices so defined or determined.

§ 10–3–1101, 3 C.R.S. (2001). The UCDPA vests the Insurance Commissioner with power to investigate specifically defined acts and practices of insurers and to enforce regulatory penalties, such as limited monetary penalties and the suspension or revocation of licenses. *See* § 10–3–1108, 3 C.R.S. (2001). However, unlike the CCPA, no private right of action may be maintained under the UCDPA. *See* § 10–3–1104, 3 C.R.S. (2001); *Farmers Group, Inc. v. Trimble,* 658 P.2d 1370, 1377–78 (Colo.App.1982), *aff'd,* 691 P.2d 1138 (Colo.1984).

### B.

■ In considering the relationship between the CCPA and the UCDPA, we are guided by several well-established principles of statutory construction. The first goal of a court construing a statute is to ascertain and give effect to the intent of the General Assembly. *People v. Guenther,* 740 P.2d 971, 975 (Colo.1987); *People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986). Constructions that defeat the obvious legislative intent should be avoided. *Dist. Court,* 713 P.2d at 921. To determine the legislative intent, courts look first to the statutory language, giving words and phrases their plain and ordinary meaning. *Moody v. Corsentino,* 843 P.2d 1355, 1370 (Colo.1993); *Guenther,* 740 P.2d at 975; *Dist. Court,* 713 P.2d at 921. Although we must give effect to the statute's plain and ordinary meaning, the intention of the legislature prevails over a literal interpretation of the statute that would lead to an absurd result. *AviComm, Inc. v. Colo. Pub. Utils. Comm'n,* 955 P.2d 1023, 1031 (Colo. 1998); *Conte v. Meyer,* 882 P.2d 962, 965 (Colo.1994).

In addition, we must keep in mind the liberal construction we have given the CCPA in prior cases. *See generally May Dep't Stores, Co. v. State ex rel. Woodard,* 863 P.2d 967 (Colo.1993); *Gym of Am.,* 493 P.2d 660. There is no record of the proceedings leading to the passage of the CCPA; however, in interpreting the statute's language we have relied on the CCPA's broad deterrent purpose and scope. In *May Department Stores,* we explained that "an expansive approach is taken in interpreting the CCPA in its entirety and interpreting the meaning of any one section by considering the overall legislative purpose." *May Dep't Stores,* 863 P.2d at 973 n. 10.

### III.

### A.

■ The first certified question asks whether the UCDPA preempts a private cause of action by an insured against an insurer under the CCPA. Assurance argues that Showpiece's CCPA claim is preempted by the UCDPA because the comprehensive insurance regulations in the UCDPA govern unfair and deceptive acts or practices on the part of the insurance industry and effectively

preclude claims brought under the CCPA. Assurance contends that the General Assembly intended that the UCDPA be the exclusive means for defining, determining, penalizing and prohibiting deceptive practices in the business of insurance. Assurance further contends that because the plain language of the CCPA and of the UCDPA are in conflict, the more specific UCDPA controls over the more general CCPA.

Showpiece argues that, in enacting the UCDPA, the General Assembly did not intend that it be the exclusive means for addressing insurance industry trade practices. Showpiece asserts that no conflict exists in either the plain language or the purposes of the statutes: The UCDPA regulates the insurance industry while the CCPA provides relief to consumers. Showpiece further argues that even if a conflict exists between the two statutes, as Assurance contends, the court must attempt to construe the statutes harmoniously, giving effect to both.

The parties in this case are not alone in their disagreement concerning the preemption of the CCPA by the UCDPA. A split of authority exists among Colorado courts as well. The district court and the parties have cited a litany of cases in which trial courts have reached contradictory conclusions regarding the applicability of the CCPA to insurance companies. Four state trial court judges and one federal trial court judge have held that the CCPA applies to insurance companies, and two state trial court judges and two federal trial court judges have held to the contrary.

### B.

■■■ After considering the plain language of the statutes at issue and the purposes served by each, we are not persuaded by Assurance's preemption argument. Assurance relies on the legislative purpose of the UCDPA to support its contention that the General Assembly intended to comprehensively regulate the insurance industry through the UCDPA and to preclude other causes of action against insurers. Assurance specifically points to the phrase "providing for the determination of[ ] all such practices" as evidence of this intent. However, this phrase must be read in context. The legislative declaration provides that the purpose of the UCDPA is to "regulate" trade practices in the insurance industry by defining, determining and prohibiting deceptive trade practices. *See* § 10–3–1101. Thus, the purpose of the UCDPA is the comprehensive regulation of insurance trade practices. Therefore, the phrase "providing for the determination of[ ] all such practices" can only mean all such practices in the regulatory context, and cannot reasonably be construed, as Assurance contends, as an intent by the General Assembly to exempt the insurance industry from other Colorado statutes.[3]

■■■ Assurance also points to the General Assembly's failure to provide for a private cause of action under the UCDPA as further evidence of its intent to preclude all such actions. This failure, however, cannot be interpreted as a bar on all private remedies for unfair and deceptive insurance practices. Nothing in the UCDPA indicates that it is intended to be the exclusive remedy for deceptive trade practices in the insurance industry. On the contrary, the UCDPA is cumulative in its powers. Section 10–3–1111 provides: "The powers vested in the commissioner by this part 11 shall be additional to any other powers to enforce any monetary or other penalties or forfeitures authorized by law with respect to methods, acts, and practices declared in part 11 to be unfair or

3. Furthermore, in using the phrase "provide for the determination of[ ] *all* such practices," the General Assembly was attempting to regulate the field in its entirety to not allow for federal antitrust regulation. Colorado adopted the original version of the UCDPA in 1949, after Congress passed the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015, which authorized federal regulation of insurance only "to the extent that such business is not regulated by state law." 15 U.S.C. § 1012(b) (2001). Thus, in enacting the UCDPA, it was the General Assembly's intent to oust federal regulation from the business of insurance by enacting its own legislation. *See Atl. & Pac. Ins. Co. v. Combined Ins. Co.*, 312 F.2d 513, 515 (10th Cir.1962); *see also Skinner v. Steele*, 730 S.W.2d 335, 337–38 (Tenn.App. 1987)("The purpose of § 56–8–101 *et seq.* is to regulate 'all such practices' in order to oust federal antitrust jurisdiction as completely as possible.").

deceptive." Thus, while the UCDPA provides for the general governance of the insurance industry, it does not encompass redress for any losses sustained pursuant to an insurance company's negligence, default, or tort. As a result, other statutes may also apply in order for private parties to obtain relief.

Assurance further argues that the specific statutory scheme of the UCDPA conflicts with the general provisions of the CCPA. To illustrate this conflict, Assurance emphasizes the fact that the CCPA permits a private cause of action, while the UCDPA does not. *Compare* § 6–1–113, 2 C.R.S. (2001) *with* § 10–3–1114, 3 C.R.S. (2001). Assurance concludes that the UCDPA constitutes specific legislation that controls over the general legislation of the CCPA. We disagree. First, the absence of a private cause of action under the UCDPA is not dispositive as to the issue of whether a conflict exists between the two statutes. As previously mentioned, the UCDPA is a regulatory statute, and as such, it stands to reason that no statutory cause of action will lie in a purely regulatory statute. In contrast, the CCPA is a remedial statute which expressly creates such a cause of action.

Second, where two statutes attempt to regulate the same conduct, the more specific statute does preempt the general statute. *See Reg'l Transp. Dist. v. Voss,* 890 P.2d 663, 668 (Colo.1995). However, this is true only to the extent that there is a manifest inconsistency between the two statutes because statutory repeals by implication are disfavored. *See People v. Dist. Court,* 196 Colo. 249, 252, 585 P.2d 913, 915 (1978); *People v. James,* 178 Colo. 401, 404, 497 P.2d 1256, 1257 (1972). Thus, a court must first attempt to construe the statutes harmoniously, giving effect to all their parts. *See* § 2–4–205, 1 C.R.S. (2001); *City of Lakewood v. Mavromatis,* 817 P.2d 90, 96 (Colo.1991). In this case, each act functions to achieve different but complementary results. The UCDPA vests in the Insurance Commissioner the power to investigate violations, issue cease and desist orders, levy limited monetary penalties, and order the suspension or revocation of insurance licenses. *See* § 10–3–1108. The CCPA, on the other hand, affords an aggrieved consumer a private statutory remedy through which he may seek compensation for damage or injury caused by deceptive trade practices. Although each statute possesses different enforcement methods and penalty provisions, these differences do not rise to the level of a conflict. Therefore, we construe the two statutes to give effect to both. *See, e.g., People v. Low,* 732 P.2d 622, 629 n. 10 (Colo.1987)(finding that statutes addressing same subject matter "must be construed in *pari materia* to carry out the intent of the General Assembly"); *People v. Downen,* 106 Colo. 557, 562, 108 P.2d 224, 226 (1940)("Clearly, if two acts may be so construed so that inconsistencies may be avoided and both upheld, it is the duty of courts to so construe them.").

In deciding this issue, we also find instructive the plain language of the CCPA. The CCPA is a broad statute of general application to "*any person* who engages in … any deceptive trade practice listed in this article." § 6–1–113 (emphasis added). "Person" is defined under the statute as meaning "an individual, corporation, business trust, estate, trust, partnership, unincorporated association, or two or more thereof having a joint or common interest, or any legal or commercial entity." § 6–1–102(6). Clearly, the definition of person under the CCPA is broad enough to encompass insurance companies. Thus, by its own terms, the CCPA applies to the acts or practices of insurance companies. Moreover, we conclude that in determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA. *See, e.g., May Dep't Stores,* 863 P.2d at 973 ("In order to effectuate the broad remedial relief and deterrence purposes, the CCPA does not require proof of actual injury."). To exempt insurance companies from the purview of the CCPA would frustrate the broad remedial purposes of the Act.

Assurance places great significance on the failure of the CCPA to specifically mention either insurance companies or insurance transactions in the list of practices that are

considered to be unfair or deceptive practices. However, this omission is not determinative. The CCPA does not list all the industries to which it applies, nor does it specify all the types of transactions it covers. In enacting the statute, the General Assembly could not have possibly enumerated all, or even most, of the practices that the CCPA was intended to cover. *See FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 240, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) ("It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again.... [I]t would undertake an endless task."). Instead, the General Assembly focused on prohibiting, in very general terms, those actions that are likely to injure the public. If we were to decide that the only practices covered are those specifically listed in the act, we would be severely hindering the CCPA's broad remedial power. We find that the list in section 6–1–105 is not exhaustive and because deceptive or unfair practices in the business of insurance could clearly injure the public they are within the purview of the CCPA.

We also find it persuasive that although certain persons and entities are expressly excluded from the provisions of the CCPA, the General Assembly did not see fit to exclude insurance companies or insurance transactions from the broad scope of the CCPA. *See* § 6–1–106(b). The CCPA was enacted in 1969, twenty years after the UCDPA, and the General Assembly, having full knowledge of the UCDPA, did not provide an exception for insurance companies. *See City & County of Denver v. Rinker,* 148 Colo. 441, 446, 366 P.2d 548, 550 (1961)("[T]here is a presumption that all laws are passed with the knowledge of those already existing...."). More importantly, the General Assembly did not exempt insurance companies from the reach of the CCPA in the reenactment of the UCDPA in 1973. If the General Assembly did not see fit to exclude insurance companies from the purview of the CCPA, it is not for this court to do so. Because exemptions in other areas have been explicitly addressed, the omission of an exemption for insurance

companies strongly indicates that the General Assembly did not intend such an exemption.

In addition to the above analysis, we have recognized that in interpreting the CCPA it is helpful to examine other states' interpretations of their consumer protection statutes. In the past we have specifically looked to Washington law because "Washington state has long served as a model for the development of consumer protection legislation." *Hall v. Walter,* 969 P.2d 224, 233 (Colo.1998); William A. Lovett, *Private Actions for Deceptive Practices,* 23 Ad. L.Rev. 271, 275 (1971). Although we recognize that the Washington Consumer Protection Act (WCPA), unlike the CCPA, specifically allows for a cause of action against an insurer for unfair or deceptive acts or practices, we nonetheless find Washington law instructive because the WCPA, like the CCPA, is a broad statute that provides for a private right of action, which is available to "any person" injured by a violation of the act. *See* Wash. Rev.Code Ann. § 19.86.090 (2001).

In *Salois v. Mutual of Omaha Insurance Co.,* 90 Wash.2d 355, 581 P.2d 1349, 1351 (1978), the Washington Supreme Court, in determining whether a post-sale bad faith insurance action gave rise to a Consumer Protection Act claim, found that it was in the public interest that the business of insurance be conducted in good faith and free from deception. Thus, the court held that an insurance company's breach of duty to use good faith and fair dealing in post-sale activities fell within the Act's purview. *Id.* at 1352. In *Rounds v. Union Bankers Insurance Co.,* 22 Wash.App. 613, 590 P.2d 1286 (1979), the Washington Court of Appeals was asked to determine whether the insurance code expressly exempted actions arising from individual insurance contracts from the WCPA's application. Expanding on the reasoning of *Salois,* the court stated: "[R]ecognizing the general purposes of the Consumer Protection Act and the insurance code, and reading and considering them together, we find no difficulty in concluding that the legislative intent [of the WCPA] was to provide a remedy for an insured who suffers due to [an insurance company's bad faith]." *Id.* at

1287–88. More recently, in *Coventry Associates v. American States Insurance Co.*, 136 Wash.2d 269, 961 P.2d 933, 937 (1998), the Washington Supreme Court held that an insured may bring a Consumer Protection Act claim against its insurer for bad faith investigation regardless of whether the insurer was ultimately correct in determining coverage did not exist.

Furthermore, states with consumer protection laws that, similar to the CCPA, do not specifically mention the insurance industry, and with insurance codes that, similar to the UCDPA, do not create a private cause of action, have held that their insurance code section on deceptive trade practices does not preempt a private right of action against an insurer for alleged consumer protection act violations. *See, e.g., Jenkins v. Commonwealth Land Title Ins. Co.*, 95 F.3d 791, 798–99 (9th Cir.1996)(concluding that the Hawaii Supreme Court would not read the Hawaii Insurance Code as preempting private actions under the Hawaii consumer protection act); *Force v. ITT Hartford Life & Annuity Ins. Co.*, 4 F.Supp.2d 843, 856 (D.Minn.1998)(interpreting *Morris v. Family Mut. Ins. Co.*, 386 N.W.2d 233 Minn. 1986), narrowly and holding that the Minnesota legislature did not intend, in passing the Insurance Act, to proscribe claims against insurers brought under the Consumer Fraud Act); *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 365 N.E.2d 802, 806 (1977)(holding consumer protection statute and statute prohibiting deceptive practices by business of insurance have concurrent application to unfair or deceptive insurance acts or practices); consumer protection statute was subsequently amended to expressly include unfair or deceptive insurance acts or practices; *N.M. Life Ins. Guar. Ass'n v. Quinn & Co., Inc.*, 111 N.M. 750, 809 P.2d 1278, 1290 (1991)(holding that causes of action may be maintained under both the New Mexico Unfair Trade Practices Act and the New Mexico Unfair Insurance Practices Act); *Pekular v. Eich*, 355 Pa.Super. 276, 513 A.2d 427, 434 (1986)(holding that the Unfair Insurance Practices Act does not bar an insured from pursuing a private cause of action against his insurer based on the provisions of the Unfair Trade Practices Consumer Protection Law),

*appeal denied*, 516 Pa. 635, 533 A.2d 93 (1987); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn.1998)(holding that the insurance regulations of the Insurance Trade Practices Act do not foreclose the application of the Consumer Protection Act to insurance companies).

Some jurisdictions have ruled against the applicability of consumer protection laws to insurance practices. *See, e.g., O.K. Lumber Co., Inc. v. Providence Wash. Ins. Co.*, 759 P.2d 523, 528 (Alaska 1988); *Comeaux v. Pa. Gen. Ins. Co.*, 490 So.2d 1191, 1193 (La.Ct. App.1986). However, the Alaska and Louisiana statutes, unlike the Colorado statute, expressly exempt the application of the consumer protection act to the regulated insurance industry. *See* Alaska Stat. § 45.50.481(3) (Michie 2001) ("Nothing in AS 45.50.471—45.50.561 applies to ... (3) an act or transaction regulated under AS 21.36 or AS 06.05 or a regulation adopted under the authority of those chapters."); La.Rev.Stat. Ann. § 51:1406 (West 2001) ("The provisions of this chapter shall not apply to: (1) Actions or transactions subject to the jurisdiction of ... the insurance commissioner....."). Thus, the results from these jurisdictions turn on the precise language of the consumer protection act in question; this language differs in a significant manner from that of the Colorado statute.

We find that there is ample evidence, both in the plain language of the statutes at issue and the purposes served by each statute, that the General Assembly did not intend, in enacting the UCDPA, to make it the exclusive remedy under state law for conduct prohibited in that Act or to exclude insurance companies from the purview of the CCPA. We find that the CCPA was meant to work in conjunction with, not to the exclusion of, the UCDPA as the statutes achieve different but complementary results. We therefore conclude that the insurance regulations in the UCDPA do not foreclose application of the CCPA to insurance companies.

## IV.

The second certified question asks us to determine whether the insurance

industry is excluded from the CCPA by section 6–1–106. Section 6–1–106, entitled "Exclusions," provides:

> (1) This article does not apply to: (a) Conduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency; (b) Publishers, including outdoor advertising media, advertising agencies, broadcasters, or printers engaged in the dissemination of information or reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character . . . .

The parties offer differing views on the proper interpretation of section 6–1–106. Assurance argues that the insurance industry is regulated by the Insurance Commissioner under Title X, and by virtue of such regulation is exempt from the provisions of the CCPA under section 6–1–106(1)(a). Showpiece argues that this statutory exclusion does not apply to conduct that is simply subject to regulation by a governmental agency, but applies only to conduct that is in compliance with the statute administered by such a governmental agency. Showpiece also contends that the absence of an exemption in section 6–1–106(1)(b) for insurance transactions is evidence of the General Assembly's intent not to exclude the insurance industry from the purview of the CCPA.

We find Showpiece's interpretation of the exclusion provision persuasive. Again, we are guided by the well-established principle of statutory construction that all words be given their commonly accepted and understood meaning. *Moody*, 843 P.2d at 1370. The plain meaning of the exclusion section of the CCPA is that conduct *in compliance* with other laws will not give rise to a cause of action under section 6–1–106(1)(a). In *Skinner v. Steele*, the Tennessee Court of Appeals, in construing a similar statutory exemption, explained:

> The purpose of the exemption is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would otherwise be a violation of the Act, but which is allowed under other statutes or regulations. It is intended to avoid

conflict between laws, not to exclude from the Act's coverage every activity that is regulated by another statute or agency. 730 S.W.2d at 337; *see also WVG v. Pac. Ins. Co.*, 707 F.Supp. 70, 72 (D.N.H.1986)("The goal of the [New Hampshire] legislature would seem to encompass avoidance of a direct conflict with a regulatory scheme."). The Tennessee court found that only those activities "specifically authorized" by a regulation or another statute were exempt. Other jurisdictions have found similarly. *See, e.g., Robertson v. State Farm Fire & Cas. Co.*, 890 F.Supp. 671, 676 (E.D.Mich. 1995)("[T]he inquiry under § 1(a) is not whether the conduct is subject to regulation, but rather whether the conduct is 'specifically authorized.' "); *WVG*, 707 F.Supp. at 72 ("[T]he issue is whether a transaction 'is otherwise permitted,' and not whether an agency exists to review the transaction.").

We find the reasoning of these courts persuasive and applicable to our statutory exemption. Thus, we hold that section 6–1–106(1)(a) exempts only those actions that are "in compliance" with other laws. Conduct amounting to deceptive or unfair trade practices, however, would not appear to be "in compliance" with other laws. In fact, deceptive or unfair trade practices in the insurance industry are expressly forbidden by the UCDPA. We disagree with Assurance that this interpretation renders the statutory exclusion a nullity. The purpose of the exclusion is to preclude the Attorney General and individual consumers from bringing an action based on practices that are "in compliance" with other laws. Under our interpretation, the statutory exclusion still serves this purpose. If we were to adopt Assurance's broad interpretation of the exclusion section, the CCPA would be rendered meaningless because almost every business is subject to some type of regulation.

Furthermore, given the broad remedial purposes of the CCPA, the General Assembly could not have intended to exclude from the protection of the Act the large number of industries that are subject to regulation. Thus, the mere existence of a regulatory body to oversee certain standards of an industry does not remove all acts and practices

of that industry from the provisions of the CCPA. As previously discussed, we also find it persuasive that the General Assembly did not exclude the insurance industry or insurance transactions from the operation of the CCPA. *See* § 6–1–106(1)(b); *Alpert Corp.*, 660 P.2d at 1297 (in holding that real estate transactions are subject to the CCPA, the court found persuasive the fact that the General Assembly had not excluded real estate transactions, although it had excluded other types of transactions). Section 6–1–106(1)(b) contains many specific industries that are exempted from the CCPA. Insurance is not one of those specific industries. Had the General Assembly meant to exclude the insurance industry from the CCPA, it is reasonable to assume that it would have included insurance in that list.

In view of the plain language of the exclusion provision and the overall purposes of CCPA, we conclude that section 6–1–106 does not exempt the insurance industry from the provisions of the CCPA.

### V.

The third certified question requires us to determine whether insurance encompasses the sale of goods, services, or property under the CCPA. Assurance argues that the performance of an insurance contract does not constitute the sale of goods, services or property. However, Assurance misinterprets the question and incorrectly focuses on the *performance of an insurance contract.* Instead, the question we are asked to consider is whether an *insurance contract* constitutes a good, service or property.

In defining what constitutes an unfair or deceptive trade practice, the CCPA focuses on instances that deal with goods, services or property. *See* § 6–1–105. The terms "goods" and "services" are not defined in the CCPA. However, in *Alpert Corp.*, the court of appeals held that these terms are to be interpreted in light of the CCPA's broad legislative purpose "to provide prompt, economical and readily available remedies against consumer fraud." *Alpert Corp.*, 660 P.2d at 1297 (citing *Western Food Plan*, 198 Colo. at 256, 598 P.2d at 1041). The term "property" is defined under section 6–1–

102(8) to mean "any real or personal property, or both real and personal property, intangible property, or services."

In *Baker v. Young*, 798 P.2d 889, 894 (Colo.1990), and in *Price v. Sommermeyer*, 195 Colo. 285, 288, 577 P.2d 752, 755 (1978), we held that an insured's rights under an automobile insurance policy constituted "property" for purposes of in rem jurisdiction and probate jurisdiction, respectively. The *Baker* court found that "[n]either the intangible character nor the contingent nature of the right under the policy should logically prevent it from being the subject of ownership." 798 P.2d at 893; *see also In re Hamilton's Estate*, 113 Colo. 141, 148, 154 P.2d 1008, 1011 (1945)("An insurance policy being a chose in action is a property right, often described as intangible property."); *DiMarzo*, 449 N.E.2d at 1196 ("The purchaser of an insurance policy acquires a contractual right to payment, a form of personal property.").

Insurance has also been found to constitute "services" subject to state consumer protection acts. In *Dodd v. Commercial Union Insurance Co.*, the Massachusetts Supreme Judicial Court found that the sales of motor vehicle insurance policies constituted both sales of property and sales of services. *Dodd*, 365 N.E.2d at 807. In explaining its decision, the court stated:

> Insurance policies are contracts in which the insurer promises to pay money to the insured or to third parties on the happening of a specified event. This contractual right to payment is a recognized property right.... Moreover, the terms of an automobile insurance policy generally include services in connection with ongoing protection of all persons within its purview. Commercial sells its claims handling services as part of its compulsory motor vehicle insurance package. Therefore, sales of its policies constitute sales of both property and services....

*Id.* In *Stevens v. Motorists Mutual Insurance Co.*, the Kentucky Supreme Court noted that "[a]n insurance policy is nothing more and nothing less than a contract providing for the delivery of financial services.... As such it is in the same class as other financial

services. Our Consumer Protection Act has no exclusion for such services simply because insurance is involved...." 759 S.W.2d 819, 821 (Ky.1988). Thus, the court held that the purchase of an insurance policy is a purchase of a "service" intended to be covered by the Consumer Protection Act. *See id.* at 820; *see also P.I.A. Michigan City, Inc. v. Nat'l Porges Radiator Corp.*, 789 F.Supp. 1421, 1426 (N.D.Ill.1992)("It is well-settled that the sale of insurance is a service to which the protections of the [Illinois] Consumer Fraud Act apply."); *Doyle v. St. Paul Fire & Marine Ins. Co.*, 583 F.Supp. 554, 556 (D.Conn.1984)(holding insurance constitutes a service under Connecticut's consumer protection act); *McCrann v. Klaneckey*, 667 S.W.2d 924, 926 (Tex.App.1984)(holding that an insurance policy is covered by the definition of "services"). *But see Wilder v. Aetna Life & Cas. Ins.*, 140 Vt. 16, 433 A.2d 309 (1981)(holding that insurance cannot be labeled either goods or services under the defined terms of the act).

We find the reasoning of the majority of the foregoing cases to be sound, and accordingly, hold that the sale of insurance can be classified as a sale of goods, services or property and is thus subject to the provisions of the CCPA.

## VI.

█ The final certified question asks us to consider whether the CCPA applies to an insurer's post-sale unfair or bad faith conduct. Assurance contends that the CCPA applies only to conduct before or at the time of the sale of goods, services or property. Therefore, Assurance concludes that the CCPA does not apply to causes of action for unfair claims handling or settlement practices. Given the Act's plain language and its statutory intent to protect consumers, we hold that the CCPA is applicable to an insurer's post-sale unfair or bad faith conduct.

Section 6–1–105 contains a list of acts that constitute unfair or deceptive trade practices. Some of the acts listed in section 6–1–105 contain temporal references. For example, section 6–1–105(1)(u) provides:

(1) A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person: ... (u) Fails to disclose material information concerning goods, services, or property which information was *known at the time of the advertisement or sale* if such failure to disclose information was intended to induce the consumer to enter into a transaction....

(Emphasis added.) However, most of the acts listed in this section do not have such temporal limitations. Because of the use of a temporal limitation in section 6–1–105(1)(u), we can assume that the General Assembly was aware of its ability to impose such limitations and chose not to do so. Therefore, we see no reason to limit the CCPA in such a manner.

We also note that the court of appeals has allowed post-sale misconduct to be actionable under the CCPA. In *Dodds v. Frontier Chevrolet Sales & Service, Inc.*, the court found that a fraudulently obtained post-sale release was a deceptive trade practice under the CCPA. 676 P.2d 1237, 1238 (Colo.App.1983). Other states have also held that post-sale conduct falls under their respective consumer protection acts. In *Salois v. Mutual of Omaha Insurance Co.*, the Washington Supreme Court rejected the defendant's argument that the consumer protection act was applicable only to those acts or practices that were designed to induce a potential buyer to purchase goods or services. 581 P.2d at 1351. In holding that post-sale acts or practices do fall under its consumer protection act, the court explained:

Taking the broad scope of [the consumer protection act] and coupling it with [its] reference to the *conduct* of any trade or commerce, we cannot conclude that the legislature intended the act to be restricted to acts or practices designed to induce a sale.

*Id.* (emphasis in original); *see also Sparks v. Allstate Ins. Co.*, 98 F.Supp.2d 933, 938 (W.D.Tenn.2000)(holding that the Tennessee Consumer Protection Act applies to claims handling procedures in insurance disputes); *Elder v. Coronet Ins. Co.*, 201 Ill.App.3d 733, 146 Ill.Dec. 978, 558 N.E.2d 1312, 1320–21 (1990)(holding that an insured may bring a

claim against his insurer based on deception in the adjustment of a claim under the Consumer Fraud Act); *Gray v. N.C. Ins. Underwriting Ass'n*, 352 N.C. 61, 529 S.E.2d 676, 683 (2000)(holding that an insurance company not attempting in good faith to effectuate prompt, fair and equitable settlements of claims constitutes a violation of its consumer protection act); *Coventry Assocs.*, 961 P.2d at 937 (holding that an insured may bring a CPA claim against its insurer when the insurer conducted a bad faith investigation of the insured's claim).

Therefore, we hold that an insured may maintain an action against its insurer for bad faith handling of the insured's claim under the CCPA.

## VII.

We conclude that a private cause of action by an insured against an insurer under the CCPA is not preempted by the UCDPA. The CCPA is meant to work with the UCDPA, not to the exclusion of it. We further conclude that the insurance industry is not excluded from the provisions of the CCPA under section 6–1–106 and that insurance encompasses the sale of goods, services, or property under the CCPA. Finally, we conclude that the CCPA applies to an insurer's post-sale or bad faith conduct and unfair claims handling practices. Accordingly, we hold that an insured, like any other consumer, may seek compensation for damages as a result of post-sale deceptive practices by an insurance company under the provisions of the CCPA. Therefore, we answer certified questions 1 and 2 in the negative, and questions 3 and 4 in the affirmative.