JUSTICE MARQUEZ
delivered the Opinion of the Court.
T1 Following a two-year investigation into the Colorado foreclosure industry, the State brought a civil law enforcement action against the foreclogure law firm The Castle Law Group, LLC and its principals, Lawrence Castle and Caren Castle (collectively, "Castle"), as well as Castle's affiliated vendors, Absolute Posting & Processing Services, LLC, Ryan O'Connell, Kathleen Benton (collectively, "Absolute"), RE Records Research, LLC ("RERR"), and Colorado American Title, LLC ("CAT"). Among other things, the State alleges that between 2009 and 2014, the Castle defendants conspired with their affiliated vendors to generate and submit deceptive invoices reflecting systematically inflated costs ineurred for foreclosure-related services, while falsely representing to mortgage servicers that these inflated costs were "actual, necessary, and reasonable." According to the State, Castle submitted the vendors' inflated invoices to the mortgage servicers, and in turn, the mortgage servicers, relying on Castle's false representation that the vendors' charges were "actual, necessary, and reasonable," reimbursed Castle for these costs as part of the foreclosures and ultimately passed the inflated costs on to the public The State contends that all the defendants benefitted from this scheme by collectively reaping millions in inflated profits from homeowners, purchasers of foreclosed homes at auction, and taxpayer-funded investors like Fannie Mae and Freddie Mac. Specifically, it alleges that Castle pocketed some of these overages as kickbacks from the vendors to cireumvent the maximum allowable fees Castle could collect, but also. contends that Castle's affiliated vendors were unjustly enriched by this scheme. The State alleges *130 that the defendants' conduct violated the Colorado Consumer Protection Act ("CCPA"), §§ 6-1-101 to 115, C.R.S8. (2015), as well as the Colorado Antitrust Act of 1992, §§ 6-4-101 to -122, C.R.S. (2015), and the Colorado Fair Debt Collection Practices Act, §§ 12-14-101 to -136, C.R.S. (2015). Only the CCPA claim is at issue in this original proceeding pursuant to C.A.R, 21.
T2 Relevant here, the State seeks to demonstrate at trial that the costs for foreclosure-related services charged by Castle's affiliated vendors and claimed by Castle were not, in fact, the "actual, necessary, and reasonable" costs for such services. Specifically, the State seeks to demonstrate that these costs were artificially inflated by comparing the invoiced rates submitted by Castle with the market rates charged by unaffiliated vendors for such services. The State retained an expert witness, Matthew Lausten, to testify, among other things, regarding the "overage" amounts Defendants obtained from their alleged deceptive trade practices as reflected by the difference in the invoiced costs and the "market rate" prices charged by unaffiliated vendors for the same services.
13 On January 7, 2016, approximately a week before the scheduled trial, the district court issued an order granting Castle's motion to limit Lausten's testimony and granting in part Absolute's motion to exclude Lausten's testimony, albeit not based on the CRE 702 reliability and relevance grounds raised in the motions. Instead, the court concluded that the market rates for foreclosure-related services are "irrelevant to Plaintiffs' cognizable claims." The court construed the State's CCPA deceptive trade practice claim to be grounded on the allegation that the Castle defendants exceeded their allowable fees by charging additional fees in the guise of costs for foreclogure-related services. The court reasoned that "[lt doesn't matter whether those charges were over or under 'market' rates; what matters is if any portion of them found their way to the Castle Defendants as disguised attorney fees...."
14 In response to the State's motion for clarification of this order, the court issued another order on January 11, 2016, ruling that "[clharging high prices is not deceptive or unjust, as long as those prices are aceu-rately disclosed. Charging high prices is not unlawful, as long [sic] those prices have not been capped by state price controls and are not the product of an antitrust violation," The court further noted that it read the State's complaint to allege that Castle received some portion of the high prices as kickbacks from the vendors in a scheme to avoid contractual or regulatory caps on their attorney fees. The court ruled that this allegation is the "only strand keeping [the State's non-antitrust] claims alive, and it is the only strand on which I will permit evidence."
5 The State sought review of the district court's January 7 and January 11 Orders pursuant to C.A.R. 21. The State contends that by excluding market rate evidence, the trial court sua sponte dismissed one of the theories that formed the basis of the State's CCPA claim and its disgorgement caleula-tions. We issued a rule to show cause.
6 Consistent with our décision in May Department Stores Co. v. State ex rel. Woodard, 863 P.2d 967 (Colo.1993), we hold that, for purposes of a deceptive trade practices claim under the CCPA, disclosure of a price charged does not automatically insulate a party from claims that the price is deceptive. Here, the State's CCPA claim alleges that 'the Castle defendants engaged in a scheme with the vendors to generate invoices with greatly inflated charges for foreclosure-related services, while Castle falsely represented to mortgage servicers that these charges were the "actual, necessary, and reasonable" costs for such services. That the invoices disclosed the prices charged for foreclosure related services misperceives the alleged deception: namely, that these prices were not, in fact, the "actual, necessary, and reasonable" costs for such services. Evidence of the market rates charged by unaffiliated vendors for such services is directly relevant to establishing whether the costs invoiced by the vendors were the actual or reasonable costs of such services, Market rate evidence is further relevant to the State's allegation that the vendors themselves also benefitted from the common scheme and serves as a benchmark for the State's disgorgement calculations. We therefore conclude that the trial *131 court abused its discretion in barring evidence of market rates for foreclosure-related services. Accordingly, we make our rule absolute and remand the matter to. the trial court for further proceedings consistent with this opinion.
I1. Facts and Procedural History
"T7 The State alleges that Castle, in conjunction with its affiliated vendors, systematically misrepresented and inflated the costs for foreclosure-related services in more than 100,000 foreclosures in Colorado. The State's expert witness report estimates that Castle passed on over $25 million in price inflation to mortgage servicers such as Fannie Mae. According to the State, these deceptively inflated costs were then passed on to, and ultimately borne by, investors and insurers of the loan, third-party purchasers acquiring property at auction, and home owners trying to save their homes.
A. The State's Complaint
8 The State's CCPA claim rests on the allegation that Castle, in concert with their affiliated vendors, systematically charged inflated and deceptive costs for posting foreclosure notices, obtaining title products, preparing documents, and providing other foreclosure-related services by using affiliated vendors to create invoices for foreclosure services at costs that are grossly inflated above the actual costs and above what unaffiliated vendors charge for such services (Le., the "market rate" for such services). Am. Compl. at ¶ 2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Apr. 15, 2015). The State alleges that the allowable fees and costs charged by a law firm conducting foreclosures are governed by the mortgage loan documents, ser-vicer agreements, investor guidelines, and state law. Id. at T 58. With respect to the allowable costs, the State alleges that the servicer agreements require that costs passed along to the servicer/investor must be "actually incurred, necessary to complete the foreclosure, and reasonable, ie., market rate," id. at 1 60, and that accordingly, Castle agreed to seek reimbursement for only its "actual, necessary, and reasonable (Le., market rate) costs," id. at T 59. The State alleges that the servicer has little incentive to serutinize these costs because it ultimately passes these costs on to others, namely homeowners, investors, and insurers. Id. at T 63. Consequently, the servicers rely on the law firm's representations that it will comply with the agreements and investor guidelines and pass through only its "actual, necessary, and reasonable" costs. Id. at ¶ 3; see also id, at ¶¶ 59, 60, 64, 69 72, 167.
T9 The gravamen of the State's CCPA claim in this case is that the invoiced costs submitted by Castle for reimbursement from the mortgage servicers were not, in fact, actual, necessary, or reasonable, as Castle (falsely) represented. See id. at 1% 2, 3, 7, 12, 49, 59, 60, 73, 83, 120, 127 151, 156, 162, 168, 166. The State's amended complaint repeatedly equates "reasonable" costs in this context with the market rate charged by unaffiliated vendors for such costs. Id. at T1 3, 7, 12, 59, 60, 64, 69. For example, the State alleges that $125 was not the actual or market rate cost for posting a foreclosure notice on a door, id. at 11 7, 20, 83, 122; that $275 was not the actual or market rate cost for a title search, id, at T9 20, 166, 179; and that $75 was not the actual or market rate cost for a title search update, id, at M 20, 179, 181. The State alleges that Castle pocketed some of these overages as kickbacks from the vendors to skirt contractual and regulatory limits on the attorney fees Castle could charge. Id. at TJ 68, 65, 66, 78, 171; However, it also alleges that its vendors were unjustly enriched by this scheme,. Id, at 1T 74, 217.
B. Pre-Trial Motions and Discovery
110 In October 2014, defendants RERR and CAT filed a motion to dismiss under CRCP. 12M)(5), arguing that the State's complaint failed to state a CCPA 'claim against them. The motion asserted that the State's complaint alleged only that the defendants charged too high a price for their services, not that the invoices contained fraudulent prices. The State responded that its complaint alleged that the invoiced costs were deceptive because the mortgage servi-cer relied on Castle's false representation *132 that the costs were "actual, reasonable, and necessary" and therefore the defendants' alleged scheme to charge the inflated prices generated millions of dollars in unlawful profits.
{11 The trial court denied the motion to dismiss. In its order denying the motion, the court noted that it agreed with the defendants' contention that charging "an amount 'above the market price'" is not actionable under the CCPA as long as the amounts charged "were accurately disclosed and billed" and the title work was actually performed. Order at 3, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Nov. 13, 2014). [hereinafter "November 2014 Order"]. The trial court went on, however, to state that the gravamen of the State's CCPA claim against these defendants was that they acted in concert with the Castle defendants to misrepresent and overstate the actual cost of their title work as part of an alleged scheme to hide the real price of the Castle defendants' attorney fees. Despite the court's comments regarding market price, the November 2014 Order did not expressly limit the scope of the State's CCPA claim or bar evidence of market rates.
{12 Indeed, it appears from the lecord before us that, following the trial court's November 2014 Order, all parties continued with discovery assuming that the State would present evidence of the market rates charged by unaffiliated vendors for foreclogure-relat-ed services. For example, in April 2015, Absolute served discovery requests asking the State to identify the vendors from which the State established its market rate data and to produce any documents with their listed prices, In May 2015, Castle served discovery asking the State to identify the vendors that provided foreclosure-related services at the State's alleged market rate. Castle also asked the State to detail its methodology and provide supporting documentation for determining the market rates for foreclosure-related services. In July 2015, both Castle and Absolute served C.R.C.P. 30(b)(6) deposition notices to the State, seeking testimony on the State's market rate allegations. .
13 In November 2015, Absolute filed a motion for summary judgment, In an order dated December 28, 2015, the trial court denied the motion with respect to the State's CCPA claim, concluding that genuine issues of material fact existed as to whether Castle received kickbacks, cither directly or indirectly, from Absolute. Relevant here, Absolute argued in its motion that the complaint presented no evidence that the. $125 it charged for a foreclosure posting was inflated beyond the market price and that the State's evidence of market price was cherry-picked and not reliable, The court rejected these arguments "for the simple reason that market price is not an issue in this case." Order at 2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Dec. 28, 2015) [hereinafter "December 2015 Order"]. The December 2015 Order did not, however, expressly limit the scope of the State's CCPA claim or bar evidence of market rates. The court rejected Absolute's contention that the State could not establish that ' the alleged deceptive trade practice significantly impacted the public, noting that the State "will have to provel ] that the Absolute Defendants conspired with the Castle Defendants to inflate the Castle Defendants' permissible fees," ~ thus injuring Castle's clients-an injury that the court noted "may well reverberate downstream to buyers who would have to pay these inflated fees." Id. at 8. *
C. January 2016 Orders
The January 2016 Orders at issue in this case issued a little over a week after the court's ruling on Absolute's motion for summary judgment, These orders addressed Castle's .and Absolute's separate motions to limit or exclude the expert testimony of the State's expert witness, Matthew Lausten. The State retained Lausten to testify regarding (1) the relationship between Castle, the affiliated vendors, and a series of entities that the State alleged were used to funnel proceeds of the deceptive costs back to Castle; (2) the monies flowing back to Castle; and (8) the "overage" amounts the defendants obtained through the alleged deceptive trade practice, as reflected by the difference between the invoiced charges and the "market rate" prices that unaffiliated vendors *133 charged for the same services. Lausten did not independently research the market rate for these services but relied in his expert report on the market rate information provided to him by the State.
15 On December 14, 2015, Absolute and Castle separately moved to strike some or all of Lausten's testimony. The defendants challenged the reliability of Lausten's conclusions under CRE 702 and the relevance of certain aspects of his report; however, neither defendant contended that the market rates for foreclogsure-related services were irrelevant to the State's CCPA claim,
116 In an order dated January 7, 2016, the court granted Castle's motion to limit Laus-ten's testimony and granted Absolute's motion to exclude Lausten's testimony as to the market rates for foreclogure-related services. Order at ¶¶ 1-2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Jan. 7, 2016) [hereinafter "January 7 Order"). The court stated, "As I indicated in my Order dated December 28, 2015, the market rates for posting, serving or title work are themselves irrelevant to Plaintiffs' cognizable claims." Id. at T 1. The court characterized the State's CCPA claim as grounded on the allegation that the Castle defendants "exceeded their contracted-for or regulated fee limits by charging excess fees in the guise of posting, serving or title charges." Id, The court reasoned that "(ilt doesn't matter whether those charges were over or under 'market' rates; what matters is if any portion of them found their way to the Castle Defendants as disguised attorney fees in sufficient amounts and under cireumstances making the scheme deceptive." Id. The court then observed in a footnote that it would "discuss at the pretrial conference the morning of trial which witnesses will now NOT be testifying ... given that market rates are not part of this case...." Id. at T 1 n. 1.
17 The State moved for elarification of the court's order. The State reiterated its allegation that the defendants worked in concert to create deceptive invoices containing inflated charges for foreclosure-related services and that all- defendants, not just Castle, were unjustly enriched as a result of this common scheme, The State expressed concern that the January 7 Order mistakenly viewed the State's CCPA claim to assert that the costs charged by defendants were deceptive only to the extent that a portion of those costs were routed to Castle's benefit, and that the Order would limit the State's claims of unjust enrichment to the amount that Castle benefited, rather than considering the unjust gains obtained by all the defendants,. The State argued that its allegations of "deception" lie not just in the fact that a portion of the costs inured to Castle's benefit as hidden attorney fees, but also in the fact that all the defendants worked together to create invoices reflecting charges unrelated. to actual costs and well above what unaffiliated vendors could charge, thereby unjustly enriching all the defendants. The State noted that the court's January 7 Order appeared to significantly shift the landscape regardifig the State's CCPA claim and unjust enrichment calculations without giving the State the opportunity to present argument on these ig-sues. The State thus sought clarification of the court's intent.
118 In an order dated January 11, 2016, the court responded that it was "surprised [this clarification] is necessary at this late date," but that the court would "re-state the rulings [it] hals] made throughout this case." Order at 1, State v. The Castle Law Grp., LLC, No, 14CV32763 (Denver Dist. Ct. Jan. 11, 2016) [hereinafter "January 11 Order"]. The court ruled that:
Charging high prices is not deceptive or unjust, as long as those prices are aceu-rately disclosed. Charging high prices is not unlawful, as long as those prices have not been capped by 'state price controls and are not the product of an antitrust violation. Incanting legally unrecognizable phrases such as "vastly inflated invoices" does not change the state of affairs,. The only reason I did not knock out all of the non-antitrust claims on dispositive motions is because I read Plaintiffs complaint to allege that some part of these high prices were kicked back to the Castle Defendants 'in a scheme to avoid contractual or regulatory caps on their attorney fees. That is the only strand keeping these claims alive, *134 'and it is the only strand on which I will permit evidence.
119 The State then petitioned this court to review the district court's January 7 and January 11 Orders pursuant to C.A.R. 21.
II. C.A.R. 21 Jurisdiction
20 Under C.A.R. 21 we will review a trial court's order "where the trial court has abused its discretion and where appellate remedy would not be adequate." People v. Darlington, 105 P.3d 230, 232 (Colo.2005). The decision to exercise original jurisdiction pursuant to C.A.R. 21 lies entirely within the discretion of the court. Fognani v. Young, 115 P.3d 1268, 1271 (Colo.2005). We have exercised original jurisdiction to review pretrial orders entered by trial courts that "will place a party at a significant disadvantage in litigating the merits of the controversy." People v. Dist. Court, 664 P.2d 247, 251 (Colo.1983). Here, the State contends that the trial court's January 7 and January 11 Orders significantly altered the seope of its CCPA claim shortly before trial, placing the State at a significant disadvantage. We conclude that the State has no other adequate remedy and that exercise of our original jurisdiction is appropriate to provide an expedited resolution.
III, Analysis
T21 As described at length above, the State seeks to show that the defendants engaged in a deceptive trade practice in violation of the CCPA by conspiring to generate invoices falsely representing that the costs they charged for foreclosure-related services were actual, necessary, and reasonable, when in fact (the State alleges), those costs bore no reasonable relationship to the defendants' actual costs or to the rates for such services that prevailed in the market at the time. The trial court concluded, as a matter of law, that evidence of the market rates charged by unaffiliated vendors for such services was irrelevant to the State's CCPA claim. We disagree.
122 The CCPA is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public. Showpiece Homes Corp. v. Assurance Co. of Am., 38 P.3d 47, 50-51 (Colo.2001). The CCPA's broad legislative purpose is to "provide prompt, economical, and readily available remedies against consumer fraud." W. Food Plan, Inc. v. Dist. Court, 198 Colo. 251, 598 P.2d 1038, 1041 (Colo.1979). To state a claim under the CCPA, the State must allege, among other things, that the defendant engaged in an unfair or deceptive trade practice. Section 6-1-105 of the CCPA sets forth a host of conduct that constitutes deceptive trade practices. Relevant here, a defendant engages in a deceptive trade practice when the defendant, in the course of business, "ImJakes false or misleading statements of fact concerning the price of ... services...." § 6-1-105(1)(0), C.R.S. (2015).
23 The State's amended complaint alleges that the defendants engaged in an unlawful deceptive trade practice by charging artificially inflated prices for foreclosure-related services while falsely representing that the prices were the "actual, necessary, and reasonable" costs of those services. Importantly, the State's theory is not simply that the defendants charged "high prices." Rather, the alleged deception is that the prices charged were not, in fact, the actual, necessary, or reasonable costs for such services, as the Castle defendants represented. To prove its theory, the State must rely on some reference point by which to measure the actual, necessary, or reasonable cost of a particular foreclosure-related service, The State contends, and we agree, that whether the defendants' invoieed cost for a particular service is the "actual" or "reasonable" cost for such a service is informed at least in part by the market rates for such services. Therefore, evidence of the market rates charged by unaffiliated vendors for such services is directly relevant to the State's CCPA deceptive trade practices claim as alleged in the amended complaint. The trial court's January Orders erroncously prevent the State from introducing evidence tending to show that the costs charged by the defendants were not the actual and reasonable costs for such services because they bore no relation to the market rates charged by unaffiliated vendors for the same services.
*135 1124 Although the defendants assert that the trial court's November 2014 Order previously ruled that market rate evidence was irrelevant, we do not read that order to bar the State from presenting such evidence at trial or otherwise to limit the seope of the State's CCPA claim. It is clear from the subsequent filings in the case that all parties continued to assume that the State intended to rely on market rate evidence to support its deceptive trade practice claim.
125 The defendants also point to a handful of rulings between the November 2014 Order and the January 2016 Orders that referenced or briefly deseribed the State's allegations that Castle received kickbacks through its scheme with its vendors.[1] The defendants contend that these orders likewise reveal that the court previously determined that evidence of market rates was irrelevant to the State's CCPA claim. None of these orders, however, actually dismissed any portion of the State's case or suggested that the State's CCPA claim was limited to its allegations of kickbacks, nor did any of these orders purport to bar the State from presenting market rate evidence or otherwise dismiss its allegations that all the defendants-including the affiliated vendors-were unjustly enriched. Indeed, on January 1, 2016, the court approved the parties' proposed Trial Management Order, which de-seribed the State's claims remaining for trial. This order broadly describes the State's CCPA claim against "All Defendants" as based on "false or misleading statements of fact concerning the price of services" and alleges that the defendants "deceived and defrauded homeowners, the public, servicers, and investorg/insurers, and obtained unjust enrichment." Order: Proposed Trial Management Order attach. at 2, State v. The Castle Law Grp., LLC, No. 14CV32763 (Denver Dist. Ct. Jan. 1, 2016).
126 Finally, Absolute and Castle's December 2015 motions seeking to limit the testimony of the State's expert witnhess-the motions that gave rise to the January 2016 Orders under review here-presupposed the relevance of the market rate testimony. These motions did not contend that market rate evidence was irrelevant to the State's CCPA claim; instead, they largely challenged the reliability of the expert's conclugions. In short, no defendant sought to limit the seope of the State's CCPA claim, and the parties all continued to assume the relevance of market rate evidence despite the court's comments in its November 2014 ruling.
127 To the extent that the court held in its January 11 Order that "[clharging high prices is not deceptive or unjust, as long as those prices are accurately disclosed," this was error. In May Department Stores Co. v. State ex rel. Woodard, 863 P.2d 967 (Colo.1993), this court rejected the contention that disclosure of a price necessarily cures any underlying deception with respect to that price. There, May Department Stores set its retail prices using comparative-price advertising. Id. at 970. To suggest to customers that its "sale" prices were discounted, the store presented a fictitious, inflated reference price as the "original price" on the advertisement. Id, The store informed its customers through in-store displays and media advertisements that the "sale" price was a substantial reduction from the "original" price. Id, The trial court determined that May Department Stores knew that the merchandise would not sell at the inflated "original" price and that the advertised "sale" price was the true regular price of the merchandise. Id. at 971. In determining appropriate injunctive relief, the trial court ordered that May Department Stores could use references to price terms such as "original price" only if it disclosed to customers its unique definition of those terms. Id. at 977 n.21.
28 We considered whether such disclosure was an adequate remedy for the deceptive advertisement practices. Id. at 978. Acknowledging that disclosure may be an adequate remedy to correct fraudulent and misleading advertising practices, we held that in some instances, disclosure does not "adequately protect against the reoceur-rence of the prohibited conduct." Id. at 979. *136 We noted, for example, that disclaimers may be ineffective or disregarded by a consumer who is confused by the disclosure. Id. We concluded that a retailer should not be permitted to continue to make false advertising claims by asserting it has disclosed its method for deception. Id, Thus, we concluded, "[Wlhen advertising is false, disclosures will not eliminate the underlying deception." Id, Importantly, we reasoned that the CCPA requires not just the disclosure of the terms of the deception, but the elimination of the false claim. Id, _
129 Hers, that the invoices disclosed the prices the defendants charged for foreclosure-related services does not immunize the defendants from claims that the prices themselves are deceptive, In other words, the accurate disclosure of a deceptively set price does not automatically legitimize the price or cure the alleged deception,. The trial court therefore erved in concluding, as a matter of law, that charging high prices is not deceptive as long as the prices are accurately disclosed.
IV. Conclusion
980 For the foregoing reasons, we hold that, for purposes of a deceptive trade practices claim under the CCPA, disclosure of a price charged does not automatically insulate a party from claims that the price is deceptive, Here, the State's CCPA claim alleges that Castle and the vendors engaged in a scheme to generate invoices with greatly inflated charges for foreclosure-related services, while Castle falsely represented to mortgage servicers that these charges were the "actual, necessary, and reasonable" costs for such services. Evidence of the market rates charged by unaffiliated vendors for such services is directly relevant to establishing whether the costs invoiced by the vendors were the actual or reasonable costs of such services, Market rate evidence is further relevant to the State's allegation that the vendors themselves also benefitted from the common scheme. We therefore conclude that the trial court abused its discretion in barring evidence of market rates for foreclosure-related services. Accordingly, we make our rule absolute and remand the matter to the trial court for further proceedmgs consistent with this opinion.
JUSTICE GABRIEL dissents, and JUSTICE HOOD joins in the dissent.

. See Orders dated December 3, 2014 (denying Absolute's motion to dismiss); May 15, 2015 (granting in part and denying in part Castle's motion to compel); September 14, 2015 (denying State's motion to compel and a third party's motion to quash).