In the Matter of Betty Ann BASS,
Attorney–Respondent.

No. 05SA279.

Supreme Court of Colorado,
En Banc.

Sept. 11, 2006.

Michael D. Brown, Arvada, Colorado, Attorney for Appellant–Respondent Betty Ann Bass.

Kim E. Ikeler, Assistant Regulation Counsel Denver, Colorado, Attorney for Appellee–Petitioner Office of Attorney Regulation Counsel.

Justice EID delivered the Opinion of the Court.

Attorney Betty Ann Bass appeals an order entered by the Presiding Disciplinary Judge ("PDJ") transferring her to disability inactive status pursuant to C.R.C.P. 251.23. We affirm.

## I.

For the past several years, Bass has been involved in a consolidated disciplinary proceeding concerning multiple complaints filed against her alleging violations of the Colorado Rules of Professional Conduct. The consolidated proceeding has been contentious and protracted, in large part because of Bass' repeated failure to follow the PDJ's orders.

After Bass failed to attend an agreed-upon mediation session in December 2004, the Office of Attorney Regulation Counsel ("OARC") filed a status report asserting that Bass' conduct raised a "substantial question" as to whether she suffers from a mental or emotional infirmity such that she could neither defend herself in the disciplinary proceeding nor meet her professional responsibilities as an attorney. According to the OARC's status report, several participants in the disciplinary proceeding expressed concern for Bass' mental condition.

At a conference on January 11, 2005, the PDJ provided Bass with the opportunity to show cause why she should not submit to an independent medical examination ("IME") in order to determine whether she suffers from a mental or emotional infirmity. After hearing arguments from the parties, the PDJ ordered Bass to undergo an IME conducted by Dr. David Wahl.

The PDJ directed the OARC to provide Dr. Wahl with a copy of the December 2004 status report as well as copies of two orders previously entered in the disciplinary proceeding. The OARC supplied these materials to Dr. Wahl, along with additional documents. All of these materials were transmitted to Dr. Wahl under a five-page cover letter summarizing the OARC's impressions about Bass' behavior.

Dr. Wahl met with Bass on two occasions and subsequently issued a report finding that she suffered from a delusional disorder that both impaired her ability to defend herself in the disciplinary proceeding and rendered her unable to fulfill her duties as an attorney. At an evidentiary hearing held on March 16, 2005, Dr. Wahl testified that his conclusions were based primarily on the mental status examination he conducted in his meetings with Bass. Dr. Wahl acknowledged that he reviewed the documents disclosed by the OARC, including the additional documents not referenced in the PDJ's directive.

The PDJ also heard the testimony of Dr. Jill McNaul, a forensic psychiatrist retained by Bass to rebut Dr. Wahl's report. Dr. McNaul testified that Bass did not suffer from a mental infirmity or illness, a conclusion she reached after meeting with Bass and talking with her on the telephone in the days preceding the hearing. Dr. McNaul conceded in her testimony that her diagnosis was based primarily on Bass' performance on a mental status examination that only tested for severe psychological disorders.

In an order entered on April 8, 2005, the PDJ held that Dr. Wahl's report was unreliable because it was based at least in part on the additional materials disclosed by the OARC. In the PDJ's view, "[i]t would be pure speculation to predict what Dr. Wahl's opinion would have been absent [the OARC's additional] disclosures." The PDJ explained in a later order that he primarily was concerned about the appearance that the OARC was improperly attempting to influence Dr. Wahl's report, rather than the existence of any actual influence by the OARC. The PDJ also found that Dr. McNaul's report was insufficient because it was the result of a truncated, last-minute examination of Bass.

In light of the additional disclosures to Dr. Wahl, the PDJ entered an order granting Bass' motion for a second IME conducted by another physician, Dr. Fred Miller. In his order, the PDJ made clear that he expected Bass to fully cooperate with Dr. Miller, and that her refusal to do so would result in an adverse inference that she suffers from an infirmity sufficient to warrant her transfer to disability inactive status. At Dr. Miller's request, the PDJ also appointed Dr. Robin Post to conduct psychological testing on Bass.

Bass repeatedly failed to cooperate with Drs. Miller and Post. She met with Dr. Miller on two occasions but refused to take a routine psychological test or provide even the most basic information. Bass failed to keep subsequent appointments with Dr. Miller, notwithstanding the PDJ's orders requiring Bass to attend and cooperate in further evaluation sessions. Bass similarly canceled several sessions scheduled with Dr. Post.

Throughout this process, Bass claimed that financial hardships prevented her from complying with the examination. In response, the PDJ took extraordinary measures to accommodate Bass. The PDJ provided Bass with funds to pay for child care and transportation, and arranged for Bass to meet with Dr. Post at the University of Colorado School of Law, near Bass' home in Boulder.

Nevertheless, Bass continued to avoid the second IME. She refused to make or keep appointments with Drs. Miller and Post by claiming new hardships—specifically, the threat of eviction. Bass attended the session scheduled with Dr. Post in Boulder, but brought her children with her, thereby frustrating Dr. Post's ability to conduct a psychological examination. In Dr. Post's opinion, Bass "was aware that the psychological examination could not be performed with five young children present."

In the course of the second IME process, and despite her repeated claims of financial distress, Bass met twice with her own psychologist, Dr. McNaul. As a result of these meetings, Dr. McNaul issued another report to the PDJ, this time opining that continued psychological testing of Bass would be unwise.

By mid-July, Drs. Miller and Post both informed the PDJ that Bass' behavior prevented a diagnosis of her mental condition. Dr. Post believed that Bass was "strongly motivated ... to avoid the present psychological examination."

On August 15, 2005, after offering Bass multiple opportunities to comply with the examination process, the PDJ heard testimony and received exhibits on the second IME. Included among the exhibits offered by the OARC were letters from Drs. Miller and Post. Against the express order of the PDJ, Bass failed to appear in person at the hearing, but instead testified by telephone.

The PDJ transferred Bass to disability inactive status on September 2, 2005, finding that "the totality of the circumstances" demonstrated by clear and convincing evidence that Bass suffered from a mental or emotional infirmity. The PDJ relied in part on Dr. Wahl's conclusion that Bass suffered from a delusional disorder, explaining that while he "previously found Dr. Wahl *might* have been influenced" by the OARC's disclosures, "Dr. Wahl testified he primarily based his opinions on the mental status examinations...." The PDJ also found that Bass' refusal to cooperate in the second IME process made it impossible for Drs. Miller and Post to complete their examinations and arrive at a diagnosis. Because of Bass' failure to comply with the second IME, the PDJ sanctioned her under C.R.C.P. 37(b)(2)(A) by making an "adverse finding" that, had the testing gone forward, Drs. Miller and Post would have concluded that Bass suffers from a mental infirmity rendering her unable to discharge her duties as an attorney.

## II.

The Colorado Rules of Procedure Regarding Attorney Discipline and Disability Proceedings require that an attorney be transferred to disability inactive status where, upon petition by any interested party, "it is shown that [the] attorney is unable to fulfill professional responsibilities competently because of physical, mental or emotional infirmity or illness...." C.R.C.P. 251.23(a). "During such time as an attorney is on dis-

ability inactive status the attorney shall not engage in the practice of law." *Id.*

Our rules permit the Presiding Disciplinary Judge to "direct such action as it deems necessary or proper to determine whether the attorney is incapacitated, including an examination of the attorney by qualified medical experts." C.R.C.P. 251.23(c). If, "upon due consideration," the PDJ determines "that the attorney is incapable of continuing to practice law or is incapable of defending in [disciplinary] proceedings ... the [PDJ] shall enter an order transferring the attorney to disability inactive status." *Id.*

On appeal, Bass argues that the PDJ committed three errors, each of which requires reversal of her transfer to disability inactive status. First, Bass contends that the disability proceeding was improper because the OARC did not file a petition before the PDJ ordered Bass to submit to an independent medical examination. Second, Bass asserts that the "law of the case" doctrine precluded the PDJ from reconsidering his decision to disregard Dr. Wahl's report. Third, Bass claims that the PDJ erred in drawing an "adverse inference" as a sanction for her refusal to cooperate in the second IME process. For the reasons we explain below, we disagree with Bass' arguments and affirm the PDJ's order transferring Bass to disability inactive status.

### A.

 C.R.C.P. 251.23(c) allows an "interested party" to "petition" the PDJ for a determination of whether an attorney-respondent is incapable of practicing law due to a mental or emotional infirmity or illness. Bass contends that the OARC's December 2004 status report is not a "petition" within the meaning of Rule 251.23 and, as a consequence, the PDJ lacked jurisdiction to hold the disability proceeding. Bass' argument presents a question of law, which we consider *de novo. See People v. Trupp,* 51 P.3d 985, 987–88 (Colo.2002) (interpretation of rules calls for *de novo* review).

We decline to adopt Bass' narrow reading of the word "petition" in C.R.C.P. 251.23(c).

Instead, we hold that a "petition" is any filing by an interested party that brings the issue of disability to the attention of the PDJ and provides sufficient notice of the issue to the attorney-respondent. Notice is sufficient when it adequately informs the attorney-respondent that an "interested party" requests that the PDJ take action to determine whether the attorney-respondent is mentally or emotionally incapable of practicing law or defending against a disciplinary complaint. *Cf. People v. Stillman,* 42 P.3d 88, 93 (O.P.D.J.2002) (holding that notice in a disciplinary setting is adequate where the attorney-respondent is provided with "a recitation of the facts revealing the offensive conduct [and] also the identification of the legal prohibition which proclaims such conduct violative of the rules applicable to a lawyer's conduct").

The December 2004 status report satisfies our requirement of a "petition" under C.R.C.P. 251.23(c) because it provided Bass with adequate notice of the OARC's request to initiate a disability proceeding. Importantly, Bass does not claim that she lacked notice of the OARC's request for a disability proceeding, and she does not explain how she has been harmed by the lack of a separate formal petition. The absence of any discernable harm to Bass supports our conclusion that notice was adequate in this case. *See In re Smith,* 989 P.2d 165, 171 (Colo.1999) (rejecting attorney-respondent's unsupported assertion of inadequate notice in disciplinary proceeding); *City of Thornton v. Bijou Irr. Co.,* 926 P.2d 1, 30 (Colo.1996) (noting that "the absence of any cognizable claim of harm resulting from the allegedly inadequate notice" suggested that notice was sufficient).

Because the December 2004 status report unquestionably put Bass on notice of the disability proceeding and gave her a meaningful opportunity to oppose the OARC's request for an IME, we find that it satisfied the "petition" requirement of C.R.C.P. 251.23(c).

### B.

 Bass next argues that the PDJ improperly considered Dr. Wahl's report in his order transferring her to disability inactive

status. According to Bass, the "law of the case" precluded the PDJ from relying on Dr. Wahl's findings after the PDJ found them to be tainted by the OARC's disclosures. We disagree.

■ The "law of the case" doctrine recognizes that "[a]lthough a trial court is not inexorably bound by its own precedents, prior relevant rulings made in the same case are generally to be followed." *People ex rel. Gallagher v. Dist. Court,* 666 P.2d 550, 553 (Colo.1983). This "discretionary rule of practice" is based primarily on considerations of judicial economy and finality. *Id.* (quoting *United States v. U.S. Smelting, Refining & Mining Co.,* 339 U.S. 186, 199, 70 S.Ct. 537, 94 L.Ed. 750 (1950)).

■ Notwithstanding these considerations, we never have held that the "law of the case" doctrine prevents a trial court from clarifying or even revisiting its prior rulings, as the PDJ did in this case. In fact, we previously have explained that "[e]very ruling or order made in the progress of an on-going proceeding may be rescinded or modified during that proceeding upon proper grounds." *Broyles v. Fort Lyon Canal Co.,* 695 P.2d 1136, 1144 (Colo.1985); *see also People v. Roybal,* 672 P.2d 1003, 1005 n. 5 (Colo.1983) ("The doctrine of the law of the case is more flexible in its application to reconsideration by the court making the decision....").

Here, the PDJ acted "upon proper grounds" when he decided to reconsider his earlier ruling on Dr. Wahl's report. Though the PDJ initially found that the report was compromised by the OARC's disclosure of additional materials, the PDJ's subsequent order clarified that his primary concern was the appearance of improper influence. The record supports the PDJ's clarification.[1] Dr. Wahl testified at the March 16, 2005, hearing that the OARC's letter and enclosures did not impact his diagnosis, although the contents of the materials "informed" some of his conclusions. Dr. Wahl's conclusions were based almost exclusively on the mental status examination he conducted in his meetings with Bass, which he described in his testimony as "a very significant part of the evaluation," "the core" of his findings, and "the heart of the diagnosis." In light of Dr. Wahl's testimony, the PDJ had "proper grounds" to reconsider his earlier finding that the IME was unreliable. *Broyles,* 695 P.2d at 1144.

In the end, however, Dr. Wahl's expert report was not the principal grounds for the PDJ's decision to transfer Bass to disability inactive status. For the reasons explained below, we believe that the PDJ's order can be affirmed solely on the basis of his "adverse finding" entered against Bass because of her repeated failure to comply with the second IME process.

## C.

■ When ordering the second IME, the PDJ made clear to Bass that her refusal to cooperate with Drs. Miller and Post would result in an adverse inference of disability. The PDJ was well within his discretion when he imposed this sanction. *See People v. Milton,* 732 P.2d 1199, 1207 (Colo.1987) (holding that the imposition of sanctions is reviewed for abuse of discretion); *KN Energy, Inc. v. Great W. Sugar Co.,* 698 P.2d 769, 787 (Colo. 1985) (same).

Under C.R.C.P. 251.18(d), proceedings before the PDJ "shall be conducted in conformity with the Colorado Rules of Civil Procedure"—which include C.R.C.P. 37. Thus as a sanction for failing to cooperate with an IME, Rule 37 permits the PDJ to enter an order finding "that the matters regarding which the [discovery] order was made or any other designated facts shall be taken to be established for the purposes of the action...." C.R.C.P. 37(b)(2)(A); *see also Smith,* 989 P.2d at 174 (upholding sanctions against attorney-respondent in disciplinary proceeding for failure to comply with discovery); *People v. Stauffer,* 858 P.2d 694, 697 (Colo.1993) (same).

As our holdings in *Smith* and *Stauffer* make clear, we have not hesitated to affirm

---

1. We have not been asked to address—and we therefore do not address—the issue of whether the disclosure of additional materials by the OARC did in fact compromise Dr. Wahl's findings.

the imposition of sanctions under Rule 37 in the context of attorney disciplinary proceedings, even where, as in *Stauffer*, the sanction clearly is outcome determinative. *See* 858 P.2d at 697 (affirming entry of default against attorney-respondent as sanction for failure to attend his own deposition). Bass offers no reason why disability proceedings should be treated differently. In each of these settings where discovery is ordered, the underlying logic behind Rule 37 is plain: a party cannot avoid the determination of a factual issue by refusing to cooperate in legitimate discovery. *See Newell v. Engel*, 899 P.2d 273, 278 (Colo.App.1994) (dismissing action as sanction for plaintiff's repeated failure to submit to psychological evaluation); *Sheid v. Hewlett Packard*, 826 P.2d 396, 399 (Colo. App.1991) ("A court is justified in imposing a sanction which terminates litigation ... if a party's disobedience ... constitutes a substantial deviation from reasonable care in complying with discovery obligations." (citation omitted)).

Despite clear notice from the PDJ, Bass utterly failed to cooperate in the second IME process. As recounted above, Bass repeatedly missed her appointments with Drs. Miller and Post or canceled them at the last minute. Even when she attended the evaluation sessions, Bass effectively short-circuited the examinations. She refused to allow Dr. Miller to administer a personality test, or even to provide Dr. Miller with basic information. She prevented Dr. Post from analyzing her mental state by bringing her children to the evaluation, despite Dr. Post's instructions not to do so. We agree with the PDJ that nothing in the record excuses Bass' behavior.

■ Bass argues that we cannot affirm the PDJ's adverse inference because there is no evidence that she acted willfully in failing to comply with the second IME. We previously have rejected the view that severe sanctions "can only be entered when there is a finding

of *willfulness* on the part of the noncomplying party." *Kwik Way Stores, Inc. v. Caldwell*, 745 P.2d 672, 677 (Colo.1987). As we explained in *Kwik Way*, "[r]equiring a finding of willfulness ... would vitiate much of the discretion which C.R.C.P. 37(d) intended to repose in the trial court for abuse or disregard of the discovery process." *Id.* Instead, "[w]here a party does not deliberately or intentionally disobey the discovery rules but nonetheless engages in a course of conduct that manifests a flagrant disregard of discovery obligations or constitutes a substantial deviation from reasonable care in complying with discovery obligations," a court may impose the sanctions contemplated by C.R.C.P. 37(b)(2). *Id.* While *Kwik Way* concerned the sanction of default, we see no reason why a greater degree of culpability must be shown before imposing the lesser sanction of an adverse inference.[2]

We note that, despite Bass' protests of financial hardships (which we accept as genuine), this case bears little similarity to other cases concerning sanctions imposed on parties claiming economic duress. For example, in *Manning v. Manning*, 136 Colo. 380, 317 P.2d 329 (1957), a case decided under a former version of Rule 37, we held that the drastic sanction of dismissal was unwarranted where the plaintiff failed to attend a court-ordered deposition because of a lack of financial resources. In *Manning*, however, the plaintiff was forced to travel from Chicago to Denver to attend the deposition, and she was denied her request that the defendant bear her travel expenses. In Bass' case, she was required to travel from Boulder to Dr. Post's office in Denver, and still failed to comply despite a disbursement of funds from the PDJ to provide for child care and transportation. In addition, Bass' financial hardships apparently did not prevent her from meeting twice with her own psychologist during the second IME process. In light of this record, Bass' refusal to cooperate

---

2. In *Kwik Way*, we also noted that "a sufficient level of culpability" for drastic sanctions under C.R.C.P. 37 "generally will be present in cases where an order compelling discovery was entered and the party failed to comply." 745 P.2d at 678 n. 9. Under such circumstances, "noncompliance would be nothing short of gross negligence." *Id.* Bass repeatedly ignored the PDJ's orders to attend evaluation sessions with Drs. Miller and Post, and her disregard establishes the "sufficient level of culpability" needed to impose the sanction of an adverse inference under C.R.C.P. 37.

in the second IME process—notwithstanding her claims of financial hardships—was sanctionable under C.R.C.P. 37.

Bass also contends that the PDJ should have imposed a lesser sanction by temporarily placing her on disability inactive status until she completed the IME process. We hardly think that would have solved the problem in this case. The PDJ still would be forced to contend with a protracted disability proceeding that only would end when Bass decided to comply with his orders. We do not believe that Colorado law leaves the PDJ at the mercy of an uncooperative attorney. *Cf. Newell*, 899 P.2d at 278; *Sheid*, 826 P.2d at 399. Instead, as in this case, the PDJ may draw an adverse inference of disability and transfer the uncooperative attorney to inactive status, thereby requiring the attorney to petition for reinstatement under C.R.C.P. 251.30.

Bass' disregard of the PDJ's orders to cooperate in the second IME process was sufficient to support an adverse inference that she was, in fact, impaired by a mental infirmity. While the OARC bears the burden of establishing disability, *see* C.R.C.P. 251.23(e), an attorney-respondent cannot frustrate the OARC's ability to satisfy that burden through delays and excuses. If those delays and excuses result in an adverse inference of disability, then the onus properly shifts to the attorney-respondent to seek reinstatement.

### III.

We agree with the OARC that it adequately petitioned the PDJ for a disability proceeding under C.R.C.P. 251.23 by filing the December 2004 status report. We also find that the PDJ had proper grounds to revisit his decision to disregard the expert report of Dr. Wahl. Even without Dr. Wahl's report, the adverse inference drawn by the PDJ was by itself sufficient to establish by clear and convincing evidence that Bass suffers from a mental or emotional infirmity or illness, and that such infirmity or illness prevents her from both defending herself in the consolidated disciplinary proceeding and fulfilling her responsibilities as an attorney. Accordingly, the PDJ's order transferring Betty Ann Bass to disability inactive status is affirmed.