Mary BRODEUR, individually and as personal representative of the Estate of Dennis Brodeur, deceased, Petitioner

v.

AMERICAN HOME ASSURANCE COMPANY and AIG Claim Services, Inc., Respondents.

No. 06SC499.

Supreme Court of Colorado, En Banc.

Oct. 9, 2007.

Irwin & Boesen, P.C., Brad R. Irwin, Chris L. Ingold, Asher M.B. Ritmiller, Dennis P. Walker, Denver, Colorado, Attorneys for Petitioner.

Kennedy Childs & Fogg, P.C., Ronald H. Nemirow, Jennifer C. Madsen, Denver, Colorado, Attorneys for Respondents.

Roberts Levin & Patterson, P.C., Bradley A. Levin, Denver, Colorado, Attorneys for Amicus Curiae The Colorado Trial Lawyers Association.

McElroy, Deutsch, Mulvaney & Carpenter, LLP, Thomas L. Kanan, Denver, Colorado, Attorneys for Amicus Curiae Colorado Defense Lawyers Association.

Hall & Evans, L.L.C., Douglas J. Kotarek, Devi C. Yorty, Denver, Colorado, Attorneys for Amicus Curiae Colorado Self Insurers' Association.

Hale Friesen, LLP, Richard A. Westfall, Peter J. Krumholz, Denver, Colorado, Attorneys for Amicus Curiae Colorado Civil Justice League.

Pinnacol Assurance, Harvey D. Flewelling, Denver, CO, Attorney for Amicus Curiae Pinnacol Assurance.

Justice MARTINEZ delivered the Opinion of the Court.

## I. Introduction

This case involves a workers' compensation claim, the handling of which eventually led Petitioner to file a complaint in district court against Respondents alleging bad faith, breach of fiduciary duty, fraud, and violation of the Colorado Consumer Protection Act, sections 6–1–101 to –1120, C.R.S. (2007) ("CCPA"). The trial court dismissed all claims on summary judgment. Petitioner appealed, and the court of appeals determined that: (1) the bad faith tort claims accrued independently of the workers' compensation proceeding and were subsequently barred by the statute of limitations; (2) the breach of fiduciary duty claims were not actionable because a workers' compensation insurer owes no fiduciary duty to an insured; (3) the fraud claims were not actionable because the statement in question was a legal opinion rather than a factual misrepresentation, and it did not qualify for the exception to the legal opinion rule for fraud claims; and (4) the CCPA claims were to be remanded for further discovery on whether Petitioner's claim involved the public impact necessary for a viable claim. We granted certiorari to review the court of appeals' decision on Petitioner's bad faith tort claims, breach of fiduciary claims, and the fraud claims, and to consider whether the public nature of the workers' compensation program satisfies the public impact required for a CCPA claim.

We affirm the judgment of the court of appeals. We hold that bad faith tort claims accrue independently of a workers' compensation proceeding, and that, because a tort action and a workers' compensation proceeding are not part of the same case, the law of the case doctrine does not apply. Further, we find that Petitioner's bad faith tort claims are barred by the statute of limitations and do not find any facts to support equitable tolling of these claims.

We also hold that there is no fiduciary or quasi-fiduciary relationship between a work-ers' compensation insurer and the insured. Therefore, Petitioner's breach of fiduciary duty claims are not actionable.

We find that Respondents' denial of treatment was a statement of a legal opinion, not a misrepresentation of fact required to support a fraud claim. Further, we find that this statement is not subject to either the superior knowledge exception or the relationship exception to the rule that a statement of a legal opinion is not actionable.

Finally, we hold that the public nature of the workers' compensation program does not satisfy per se the public impact requirement for a CCPA claim, nor do the facts in the record support a finding that the public impact element has been satisfied in this particular case. However, we affirm the court of appeals' decision to remand this issue for further proceedings, including discovery.

## II. Facts and Procedural History

Dennis and Mary Brodeur, husband and wife, drove long-haul trucks as a team for Interstate Distributor Company ("Interstate"). Dennis Brodeur ("Brodeur") filed a claim under the Workers' Compensation Act of Colorado, sections 8–40–101 to –47–209, C.R.S. (1997), claiming he had injured his back on the job in December 1997. American Home Assurance Company ("American") provides workers' compensation insurance for Interstate, and AIG Claim Services, Inc. ("AIG") is American's third-party administrator that adjusted Brodeur's claim.

AIG initially denied treatment for Brodeur's injury, questioning whether it was work-related. After a hearing on the matter in December 1998, an administrative law judge ("ALJ") ordered Interstate and American to pay Brodeur's "reasonable and necessary medical expenses from authorized providers."

In May 1999, one of Brodeur's authorized doctors recommended back surgery for Brodeur, which AIG initially approved in June 1999. Before Brodeur underwent surgery, however, the doctor discovered that Brodeur's blood platelet count was low. Because this condition presented a risk of uncontrolled bleeding during the surgery, the

doctor referred Brodeur to a hematologist. On August 5, 1999, the hematologist informed Interstate and American that Brodeur needed to be treated with WhinRho, a drug that boosts platelet counts, prior to the surgery.

Under Colorado's then-existing Workers' Compensation Regulations, an insurer was required to issue a written denial of requested treatment within five business days, along with specific supporting information, or the request would be "deemed authoriz[ed]."[1] However, it was not until August 20, 1999, eleven business days later, that counsel for Interstate sent a letter denying authorization for the WhinRho treatment on the basis that the WhinRho treatment was unrelated to the industrial injury. Further, the letter did not contain the supporting information required by the regulations. Interstate's counsel also called into question the authorization for the back surgery itself, stating, "[I]t appears that the surgery you intend to perform on this individual is elective in nature."

Brodeur requested a hearing and sought an order for the WhinRho treatment and back surgery. Brodeur also requested penalties under section 8–43–304(1), C.R.S. (1999), based on Interstate's and American's (1) failure to comply with the December 1998 ALJ order, (2) violation of the regulations regarding denial of authorization for the treatment, and (3) violation of section 8–43–503(3), C.R.S. (1999).[2] Also, on November 1, 1999, Brodeur's counsel responded to Interstate's counsel, notifying her of the hearing request. In part, the letter stated, "I also advise you by this letter that the insurance carrier is handling this claim in bad faith."

An ALJ heard the matter in February 2000 and issued an order in April 2000 for Interstate and American to pay for the WhinRho treatment and back surgery. However, the ALJ denied Brodeur's request for penalties, finding that (1) Brodeur had not shown a failure to comply with the December 1998 order, (2) even if a violation of the regulations occurred, section 8–43–304(1) penalties were inapplicable, and (3) although Interstate and American erroneously refused to authorize reasonable and necessary care, their conduct did not violate section 8–43–503(3).

On June 15, 2000, before the WhinRho treatment was administered or the back surgery performed, Brodeur was killed in a car accident.

Mary Brodeur ("Petitioner") sought review of the ALJ's denial of penalties from the Industrial Claims Appeals Office ("ICAO"). In a March 2001 order, the ICAO affirmed the ALJ's April 2000 order. As to the violation of the regulations, the ICAO agreed that section 8–43–304(1) penalties were inapplicable. Regarding the alleged violation of section 8–43–503(3), the ICAO concluded that resisting payment for the proposed treatment did not constitute dictating the course of treatment. Instead, Interstate and American merely exercised their right "to challenge the reasonableness and necessity for [sic] proposed medical treatment" and "to contest liability concerning issues on which [Brodeur] had the burden of proof."[3] Petitioner appealed the ICAO's decision to the court of appeals.

The court of appeals remanded the ICAO's decision in part and affirmed it in part. *Brodeur v. Indus. Claim Appeals Office*, No. 01CA0635, slip op. at 7–8 (Colo.App. Dec. 6, 2001) (not selected for official publication pursuant to C.A.R. 35(f)). Specifically, the court held that penalties for violation of the regulations were available under section 8–43–304(1) and remanded the case to determine if a violation of the regulations had occurred such that penalties were warrant-

---

1. 7 Colo.Code Regs. § 1101–3 (1999), subsections XVI(I) and (J), now subsections 16–9 and 16–10.

2. Section 8–43–503(3) prohibits "[e]mployers, insurers, claimants, or their representatives" from dictating "to any physician the type or duration of treatment or degree of physical impairment."

3. The ICAO also stated, "We understand the ALJ to have found that ... the respondents did not engage in bad faith litigation and thereby attempt to 'dictate' [Brodeur's] course of treatment." We note that the language of sections 8–43–503(3) and 8–43–304(1) does not contain the term "bad faith."

ed.[4] However, the court of appeals agreed with the ALJ and the ICAO that Interstate and American had not violated section 8–43–503(3) since they were merely "exercising their statutory right to contest liability" concerning the requested treatment.[5]

On remand, by order dated June 21, 2002, the ALJ found that American failed to comply with the regulations when it denied the WhinRho treatment, and that there was no reasonable medical or legal basis for the denial. Thus, the ALJ imposed penalties against Interstate and American under section 8–43–304(1) of seventy-five dollars per day from the date Brodeur filed his application for a hearing until the date of the hearing on the matter.

Subsequent to the ALJ's order on remand, Petitioner filed this lawsuit against American and AIG ("Respondents") in Denver District Court on August 23, 2002. On behalf of Brodeur and for herself individually, Petitioner asserted eight different causes of action (for a total of sixteen claims) arising from Respondents' handling of Brodeur's workers' compensation claim. Specific to the case before us, Petitioner claimed (1) breach of the duty of good faith, (2) breach of fiduciary duty, (3) fraud, and (4) violation of the CCPA. The trial court entered summary judgment for Respondents on all claims. As relevant to the issues before us, the trial court found that the bad faith breach claims were time-barred. The court noted the letter dated November 1, 1999, announcing a bad faith claim, but based its finding on the fact that Brodeur's death was "arguably the last date to commence the running of the two-year statute of limitations." The court

dismissed the fiduciary duty claim on the basis that an insurer is not in a fiduciary relationship with the insured. The fraud claims were also dismissed as the court found no factual basis that Respondents made false representations. Finally, the CCPA claims were dismissed because the trial court found no evidence that the alleged deceptive trade practice affected the public as necessary to maintain a CCPA claim. Petitioner appealed.

The court of appeals affirmed the trial court's decision in part, and vacated and remanded in part. *Brodeur v. Am. Home Assurance Co.*, No. 03CA1710, slip op. at 29, 2006 WL 488731 (Colo.App. Mar.2, 2006) (not selected for official publication pursuant to C.A.R. 35(f) ). Pertinent to the issues before us, the court concluded that Petitioner's bad faith claims were barred by the two-year statute of limitations because Petitioner's claim accrued no later than June 15, 2000, the date of Brodeur's death. *Id.* at 7–8. The court also affirmed the trial court's dismissal of the breach of fiduciary duty claims, holding that a workers' compensation insurer does not have a fiduciary relationship with an insured. *Id.* at 21–26. Additionally, the court found that Petitioner's fraud claims were not actionable, as the alleged misrepresentation was a statement of law, not of fact, and was not an exception to the general rule that legal opinions are not actionable. *Id.* at 26–29. Finally, the court remanded the CCPA claims for further proceedings, including discovery, on the public impact issue. *Id.* at 14–21.

Mary Brodeur petitioned for certiorari, and we granted the petition.[6]

---

4. The court of appeals noted that after the ALJ and the ICAO determined that penalties under section 8–43–304(1) were not available for a violation of the regulations, this court in *Holliday v. Bestop*, 23 P.3d 700, 702 (Colo.2001), overruled *Sears v. Penrose Hospital*, 942 P.2d 1345 (Colo. App.1997), on which both the ALJ and the ICAO had relied. The court of appeals concluded that following *Holliday* the violation Brodeur alleged could support the imposition of penalties under section 8–43–304(1). Thus, the court of appeals ordered the ALJ to determine whether Interstate's and American's conduct constituted a violation of the regulations and to reconsider Brodeur's claim for penalties.

5. Like the ICAO, the court of appeals also reasoned that Interstate and American did not engage in "bad faith litigation."

6. We granted certiorari on the following issues, although originally in a different order:

(1) Whether the trial court erred in its finding of when a bad faith tort claim began to accrue for statute of limitations purposes while an administrative proceeding involving sanctions was ongoing.

(2) Whether the dismissal of a breach of fiduciary duty claim against Respondent was improper because the conduct involved insurance mandated by the Workers' Compensation Act.

## III. Analysis

### A. Standard of Review

We review a grant of summary judgment de novo. *In re Tonko,* 154 P.3d 397, 402 (Colo.2007); *Natural Energy Res. Co. v. Upper Gunnison River Water Conservancy,* 142 P.3d 1265, 1276 (Colo.2006). Summary judgment is a drastic remedy appropriate only when the pleadings and supporting documents show that no genuine issue as to any material fact exists, and the moving party is entitled to summary judgment as a matter of law. *Tonko,* 154 P.3d at 402. When determining whether summary judgment is an appropriate remedy, the nonmoving party is entitled to the benefit of all favorable inferences reasonably drawn from the undisputed facts; all doubts must be resolved against the moving party. *Id.; Natural Energy Res. Co.,* 142 P.3d at 1276.

### B. Accrual of Statute of Limitations on Bad Faith Tort Claims

It is uncontested by the parties that the tort of bad faith is governed by a two-year statute of limitations. *See* § 13–80–102(1)(a), C.R.S. (2007). The issues before us are when Petitioner's claims accrued and whether the accrual was tolled because Petitioner first sought relief through the administrative process provided by the Workers' Compensation Act.

The court of appeals determined that Brodeur and Petitioner knew of the basis of their bad faith tort claims on November 1, 1999, when Brodeur's counsel stated in a letter that Respondents were handling the claim in "bad faith." *Brodeur,* No. 03CA1710, slip op. at 7. Further, the court found that "any benefits [Petitioner] was due either derivatively or directly as survivor was [sic], at the latest, due [when Brodeur died] and any misconduct of [Respondents] was known then. Therefore, any bad faith claim

brought after June 15, 2002 would be untimely." *Id.* at 8. Petitioner maintains that the claims could not have accrued before the ALJ's order of June 21, 2002, because before that date the tort action could not have been successfully brought given the previous rulings issued as part of the administrative proceeding. Petitioner's position is based on two arguments: (1) the claim and injuries did not become "known" until a final determination occurred in the workers' compensation action; and (2) the law of the case doctrine would have precluded a successful tort action since the ALJ did not find that Respondents acted in bad faith until the June 2002 order. Alternatively, Petitioner argues that the statute of limitations on the tort claims was equitably tolled while she pursued administrative remedies. Respondents maintain that the claims accrued as early as August 23, 1999, when Respondents' "bad actions" first became known to Brodeur and Petitioner, and no later than April 5, 2000, when the ALJ ordered Respondents to pay for the WhinRho treatment and back surgery.

We find that Petitioner's bad faith tort claims had accrued by November 1, 1999, when Brodeur's attorney stated that Respondents were handling the claim in bad faith. The accrual date for the bad faith tort claims was not delayed by the workers' compensation proceeding, as a tort claim and a workers' compensation claim are different and distinct causes of action. Further, because a tort claim and a workers' compensation claim are not part of the same case, the law of the case doctrine does not apply. Finally, under these facts, the accrual date for the bad faith tort claims was not equitably tolled by Petitioner's pursuit of administrative remedies.

In *Farmers Group, Inc. v. Trimble,* we recognized an implied covenant of good faith and fair dealing in every insurance contract, whether the insurer is attending to the claims of third persons against the insured or

---

(3) Whether it was an error for the court of appeals and the trial court to dismiss Petitioner's fraud claims by incorrectly characterizing a letter by Respondent's attorney as a legal opinion rather than a factual misrepresentation, or in the alternative, was it an error to fail to recognize that the letter qualifies for the exception to the legal opinion rule for fraud claims.

(4) Whether the court of appeals should have recognized that the public nature of the workers' compensation insurance program was sufficient to satisfy the "public impact" component of claims under the Colorado Consumer Protection Act.

the claims of the insured itself. 691 P.2d 1138, 1141 (Colo.1984). A breach of this implied covenant subjects the insurer to liability in tort. *Id.* In *Travelers Insurance Co. v. Savio*, we extended *Trimble* by holding that a workers' compensation claimant may also bring an action in tort for bad faith by an insurer. 706 P.2d 1258, 1273–74 (Colo.1985). Our holding stemmed from several findings. First, we noted that bad faith handling of a claim by an insurer is not a risk contemplated by the general coverage provisions of the Workers' Compensation Act. *Id.* at 1266. Further, we stated that "the tort of bad faith depends on the conduct of the insurer regardless of the ultimate resolution of the underlying compensation claim." *Id.* at 1270. Thus, we concluded that such a claimant need not exhaust the administrative remedies under the Workers' Compensation Act before pursuing a bad faith tort claim, as the administrative remedies doctrine does not apply where an agency has no authority to determine the issue raised. *Id.* at 1269. We also established the elements of a bad faith tort claim in the workers' compensation context, stating that it requires that the insurer (1) acted unreasonably and (2) with knowledge of or reckless disregard for the fact that no reasonable basis existed for its action.[7] *Id.* at 1274.

■ In *Vaughan v. McMinn*, 945 P.2d 404, 410 (Colo.1997), we determined that the addition of section 8–43–304(1) penalties to the Workers' Compensation Act did not abrogate the common law tort of bad faith we allowed in *Savio*. Specifically, since the Act did not explicitly bar bad faith tort claims, and the addition of section 8–43–304(1) penalties was not inconsistent with *Savio*, we declined to conclude that the legislature intended to abolish the bad faith tort remedy. *Id.* at 408–09. Thus, we have consistently held that bad faith tort claims are distinct and separate actions available to workers' com-

pensation claimants in addition to remedies under the Workers' Compensation Act, and that the resolution of bad faith tort claims is independent from the resolution of workers' compensation claims.

■ These holdings necessarily extend into our determination of when a workers' compensation claimant's bad faith tort claim accrues. Pursuant to Colorado's discovery rule, a cause of action for a bad faith tort claim accrues "on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence." § 13–80–108(1), C.R.S. (2007). Thus, Petitioner's bad faith tort claims accrued when she and Brodeur knew or should have known, respectively: (1) of their injury, and (2) of the cause of their injury. Here, Respondents' unreasonable denial or delay of medical benefits ("the cause of the injury") resulted in Brodeur's not receiving the Whin-Rho treatment and back surgery in a timely manner ("the injury").[8]

Our determination that Petitioner's bad faith tort claims accrued when Petitioner and Brodeur knew of the injury and its cause is not affected by the fact that a workers' compensation proceeding was ongoing. There is no requirement under the accrual statute that any element of a workers' compensation claimant's bad faith tort claim be acknowledged or affirmed by an administrative body or other authority before a bad faith tort claim can be pursued. To the contrary, *Savio* and *Vaughan* underscore that bad faith tort claims are to be treated independently from the resolution of any workers' compensation claim.

We disagree with Petitioner's position that the injury could not have been "known" pursuant to section 13–80–108(1) until a final determination occurred in the workers' compensation action. Under certain circumstances, knowledge of the plaintiff's injury may be dependent on a final adjudication in

---

7. As we noted in *Savio*, bad faith is not limited to a decision to deny a claim; rather, bad faith can occur in the unreasonable refusal to investigate a claim or to gather facts. 706 P.2d at 1274 n. 20.

8. We note that an injury is different from the damages that flow from the injury. Pursuant to the language of section 13–80–108(1), damages

do not need to be known before accrual of a claim. *See Dove v. Delgado*, 808 P.2d 1270, 1274 (Colo.1991) (holding that the plaintiff's uncertainty as to the extent of her damages did not prevent the filing of her complaint within the two-year limitations period where the fact of injury was known since the date of her accident).

another action. For example, the plaintiff in *Vanderloop v. Progressive Casualty Insurance Co.* asserted a bad faith tort claim against his insurance company, alleging that the insurer wrongfully failed to settle with a third party within policy limits. 769 F.Supp. 1172, 1174 (D.Colo.1991). Judgment was rendered in the underlying negligence action, and because the insurer failed to settle within the policy limits, the plaintiff was exposed to excess liability. *Id.* at 1175. Thus, the court found that the plaintiff's bad faith tort claim did not accrue until final judgment in the underlying negligence case established the plaintiff's excess liability. *Id.* However, the court distinguished the alleged bad faith conduct in *Vanderloop*—failure to settle, which required a judgment with excess liability to create the injury necessary for accrual—from one where the alleged bad faith conduct is the insurer's refusal to provide insurance coverage, as in the instant case. *Id.* Where the bad faith conduct alleged is refusal to provide insurance coverage, the court specifically noted that an insurer's duty of good faith can be breached before judgment in the underlying case is rendered. *Id.*[9]

Thus, *Vanderloop* is distinguishable from the facts of the instant case, while being consistent with both section 13–80–108(1) and our holding here. In *Vanderloop*, the injury was not "known" in accordance with section 13–80–108(1) until the final judgment in another action exposed the plaintiff to excess

liability. However, the injury alleged here was not dependent on the outcome of any other action. The injury underlying Petitioner's bad faith tort claims was the fact that Brodeur did not receive medical treatment in a timely manner. This injury occurred regardless of the ultimate outcome in the workers' compensation proceeding. *See also Daugherty v. Allstate Ins. Co.*, 55 P.3d 224, 228 (Colo.App.2002) (holding that the plaintiff's bad faith tort claim based on the insurer's breach of its duty to defend accrued no later than when the plaintiff was named in a lawsuit in which his insurance company refused to defend him, not the date of the final judgment in the lawsuit, because it was at that time that the plaintiff knew the injury he suffered as a result of the alleged bad faith conduct and the cause of that injury).[10]

Even once the elements necessary for accrual are clear, it can be difficult to prove exactly when a plaintiff knew or should have known of both the injury and its cause pursuant to section 13–80–108(1). Here, however, Brodeur's counsel asserted that Respondents were handling the claim in bad faith in a letter dated November 1, 1999. Thus, this letter evidences that Petitioner's bad faith tort claims accrued no later than this date on which Brodeur's counsel asserted knowledge of a bad faith claim. Because Petitioner's claims were filed more than two years after November 1, 1999, it is unnecessary for us to determine if there was evidence that the claims actually accrued at an earlier date.[11]

9. Petitioner also mistakenly relies on *Doyle v. Linn* for the proposition that an injury cannot be "known" until the conclusion of underlying litigation. 37 Colo.App. 214, 216, 547 P.2d 257, 259 (1975). *Doyle* involved the interpretation of section 13–80–110, C.R.S. (1973), which established a six-year statute of limitations on causes of action. *Id.* at 214, 547 P.2d at 258. However, this statute did not define when an action accrued. In 1986, the General Assembly adopted Colorado's discovery rule, section 13–80–108, and it is this later statute in its current form that governs our determination of accrual in the instant case.

10. Although this holding from *Daugherty* is correct, there is an earlier statement in that same opinion that is outdated on which Petitioner mistakenly relies. Although the *Daugherty* court analyzed the accrual issue using section 13–80–108(1), it also incorrectly cites case law regarding the determination of accrual that predates

the General Assembly's adoption of section 13–80–108. Specifically, Petitioner relies on the statement in *Daugherty* that "[t]he procedure to be utilized in determining when a cause of action accrues is to ascertain when litigation could first have been successfully maintained." *Id.* at 226 (citing *Flatiron Paving Co. v. Great Sw. Fire Ins. Co.*, 812 P.2d 668, 670 (Colo.App.1990)). In turn, *Flatiron* relied on a court of appeals' decision from 1975, *Tucker v. Claimants in Death of Gonzales*, 37 Colo.App. 252, 546 P.2d 1271 (1975). However, *Flatiron* and *Daugherty* should not have quoted *Tucker*, as its rule for determining the date of accrual was replaced by the General Assembly's adoption of a specific statute governing determination of accrual, section 13–80–108, in 1986. The current version of section 13–80–108 governs our determination of accrual here.

11. The court of appeals noted that Petitioner and Brodeur knew the basis for their bad faith cause of action by November 1, 1999. However, fur-

*See Miller v. Byrne,* 916 P.2d 566, 582 (Colo. App.1995) (holding that plaintiff's negligence claim accrued when plaintiff's counsel sent a letter to the defendants alleging gross ineptitude); *Harmon v. Fred S. James & Co. of Colo.,* 899 P.2d 258, 261 (Colo.App.1994) (noting that letter from the plaintiff's attorney to insurer claiming the insurer was acting in bad faith was evidence of the plaintiff's knowledge of bad faith claim).

We also find that the "law of the case" doctrine does not apply as between a workers' compensation proceeding and an action in tort. The law of the case doctrine recognizes that "[a]lthough a trial court is not inexorably bound by its own precedents, prior relevant rulings made in the same case are generally to be followed." *In re Bass,* 142 P.3d 1259, 1263 (Colo.2006) (quoting *People ex rel. Gallagher v. Dist. Ct.,* 666 P.2d 550, 553 (Colo.1983)). This discretionary rule of practice is based primarily on considerations of judicial economy and finality. *Id.* Petitioner argues that under the law of the case doctrine, the March 2001 order of the ICAO stating that Respondents did *not* engage in bad faith litigation precluded bringing the bad faith tort claims until the June 2002 ALJ order, which lifted the preclusion by stating that Respondents had acted in bad faith. We disagree. Rulings made by an ALJ or the ICAO on a workers' compensation matter are not binding on a court's determination of a bad faith tort claim. As we stated in *Savio,* "[t]he duty of an insurer under the [Workers' Compensation] Act to provide benefits and compensation is factually and analytically distinct from its duty to deal in good faith." 706 P.2d at 1270. Thus, the rulings made in the workers' compensation proceeding were not part of the "same case" as the bad faith tort claims and did not need to be considered by the trial court under the law of the case doctrine.

We also hold that Petitioner's bad faith tort claims were not equitably tolled by the workers' compensation proceeding. The statute of limitations may be equitably tolled where the defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely manner. *Dean Witter Reynolds, Inc. v. Hartman,* 911 P.2d 1094, 1096 (Colo.1996). Other jurisdictions have applied equitable tolling where "extraordinary circumstances" make it impossible for the plaintiff to file his or her claims within the statutory period. *Id.* at 1097. The reasoning underlying these latter cases is that it is unfair to penalize the plaintiff for circumstances outside his or her control, so long as the plaintiff makes good faith efforts to pursue the claims when possible. *Id.* "Thus, an equitable tolling of a statute of limitations is limited to situations in which either the defendant has wrongfully impeded the plaintiff's ability to bring the claim or truly extraordinary circumstances prevented the plaintiff from filing his or her claim despite diligent efforts." *Id.* at 1099.

The facts of this case do not support the application of equitable tolling. Petitioner has not alleged that Respondents' wrongful conduct prevented her from filing her bad faith tort claims in a timely manner. Petitioner claims only that the litigation about Interstate's and American's conduct in denying medical care to Brodeur was an "exceptional circumstance" that tolled the statute of limitations from April 2000 (the date of the ALJ order requiring Respondents to provide the WhinRho treatment) to June 2002 (the date of the ALJ order on penalties). We disagree. In *Dean Witter Reynolds,* we noted three cases from other jurisdictions where extraordinary circumstances tolled the statute of limitations. *Id.* at 1097. All those cases involved facts where the plaintiff was

---

ther language in the court of appeals' opinion suggests that Brodeur's death may have extended the accrual date beyond November 1, 1999, or possibly created a "last possible" accrual date, or both. Quoting the trial court, the division stated, "[A]ny benefits [Petitioner] was due either derivatively or directly as survivor was [sic], at the latest, due then and any misconduct of [Respondents] was known then. Therefore, any bad faith claim brought after June 15, 2002 would be

untimely." *Brodeur,* No. 03CA1710, slip op. at 8. We reject any implication in this language that Brodeur's death may have extended the bad faith tort claim accrual date beyond November 1, 1999. Further, having found that November 1, 1999, was the date of accrual, we do not reach the issue of whether Brodeur's death created any outside date restriction on accrual of these claims.

truly precluded from bringing a claim by circumstances outside of his or her control.[12] In contrast, an ongoing workers' compensation proceeding did not prevent Petitioner from bringing her bad faith tort claim.

Further, since stating in *Dean Witter Reynolds* that extraordinary circumstances may toll the statute of limitations, this court has never found such circumstances to exist. To the contrary, we have repeatedly held that awaiting the result of another case or another legal proceeding is not the type of "extraordinary circumstance" necessary to equitably toll the statute of limitations. For example, in *Dean Witter Reynolds*, the explanation that the plaintiffs delayed filing suit while awaiting results of an appeal of an underlying case did not support equitable tolling, even when during that period of time the plaintiffs would not have had any damages pending resolution of the underlying claim. *Id.* In *Morrison v. Goff,* we held that the statute of limitations for legal malpractice is not tolled pending appeal of an underlying criminal case, even when the client filed a complaint with the Supreme Court Disciplinary Council alleging negligence and then, more than two years later, sued the attorney for malpractice based on the same facts. 91 P.3d 1050, 1058 (Colo. 2004). Similarly, the court of appeals concluded in *Noel v. Hoover* that delaying the filing of a malpractice claim against an accountant to await the outcome of IRS proceedings did not toll the statute of limitations for a professional negligence claim. 12 P.3d 328, 330–31 (Colo.App.2000).

In sum, Petitioner was not prevented— either by the wrongful conduct of Respondents or by any extraordinary circumstances presented by the workers' compensation proceeding—from filing her bad faith tort claims within the statute of limitations.

Our determination that the accrual of a bad faith tort claim is not tolled by a workers' compensation proceeding is also consistent with the holding we adopted in *Morrison.* 91 P.3d at 1050. In *Morrison,* we determined that the statute of limitations period for legal malpractice actions is not tolled while a plaintiff pursues an action for appellate or post-conviction relief. *Id.* at 1058. We favored this "two-track" approach because it furthers the statutes of limitations' goals of promoting justice, preventing unnecessary delay, and avoiding the litigation of stale claims. *Id.* at 1056 (citing *Dean Witter Reynolds,* 911 P.2d at 1096). We also found that the two-track approach comported with principles of accrual and tolling by allowing courts to evaluate on a case-by-case basis when claims accrue and when statutes of limitations require tolling. *Id.* Finally, we adopted the two-track approach because it was consistent with the statutory definition of accrual and Colorado precedent regarding equitable tolling. *Id.* at 1057.

We find the arguments from *Morrison* relevant and persuasive in considering whether a bad faith tort claim accrues independently from a workers' compensation claim. Severing a bad faith tort claim from an administrative proceeding furthers the statutes of limitations' goals of promoting justice, preventing unnecessary delay, and avoiding the litigation of stale claims. It also comports with principles of accrual and tolling by allowing courts to evaluate on a case-by-case basis when bad faith tort claims accrue and when statutes of limitations require tolling. Finally, as we explained earlier, severing bad faith tort claims from an administrative proceeding is consistent with the statutory definition of accrual in section 13–80–108(1) and Colorado precedent regarding equitable tolling.

We conclude that the court of appeals and the trial court properly determined that the statute of limitations barred Petitioner's bad faith tort claim. The statute of limitations bars bad faith tort actions brought more than two years after the claim accrues. § 13–80–102(1)(a). Bad faith tort claims accrue when

---

12. In *Hanger v. Abbott,* the courts in southern states were closed during the Civil War. 73 U.S. 532, 534, 18 L.Ed. 939 (1867). In *Seattle Audubon Society v. Robertson,* the district court's erroneous enforcement of an unconstitutional statute barred the plaintiff from filing claims in a timely manner. 931 F.2d 590, 596–97 (9th Cir.1991), *rev'd on other grounds,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). In *Osbourne v. United States,* the plaintiff was interned by Japan during World War II. 164 F.2d 767, 768–69 (2d Cir.1947).

a plaintiff knows or should have known through reasonable diligence of both the injury and its cause. § 13–80–108(1). Here, Petitioner and Brodeur knew of Respondents' bad faith handling of Brodeur's claim no later than November 1, 1999, when Brodeur's counsel sent the letter to Interstate's counsel stating that "the insurance carrier is handling this claim in bad faith." Thus, Petitioner's bad faith tort claims had expired under the statute of limitations no later than November 1, 2001, more than ten months before she actually brought her claims. Moreover, Petitioner has not presented any facts under which principles of equity might toll the statute of limitations. Therefore, we affirm the court of appeals' determination that the statute of limitations bars Petitioner's bad faith tort claims.

### C. Fiduciary Relationship

The court of appeals rejected Petitioner's breach of fiduciary duty claims, stating that Respondents owed no fiduciary or quasi-fiduciary duty to Brodeur. *Brodeur*, No. 03CA1710, slip op. at 25–26. Petitioner argues that there was a fiduciary or quasi-fiduciary relationship between the parties because the conduct involved insurance mandated by the Workers' Compensation Act. We affirm the judgment of the court of appeals.

▌ "A fiduciary relation[ship] exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation[ship]." *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993) (quoting Restatement (Second) of Torts § 874 cmt. a (1979) ); *see also Destefano v. Grabrian*, 763 P.2d 275, 284 (Colo.1988) ("A fiduciary is a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with the undertaking."). A fiduciary relationship may exist as a matter of law or may arise where one party occupies a superior position relative to another. *Moses*, 863 P.2d at 321 (citing *Bailey v. Allstate Ins. Co.*, 844 P.2d 1336, 1339 (Colo.App.1992); Stuart M. Speis-

er et al., *The American Law of Torts*, § 36:81 (1983) ). However, an unequal relationship does not automatically create a fiduciary duty. *Id.* at 322. In order to be liable, the superior party must assume a duty to act in the dependent party's best interest. *Id.* (citing *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817 (10th Cir.1986); *First Nat'l Bank of Meeker v. Theos*, 794 P.2d 1055 (Colo.App.1990)).

We have never directly addressed whether, as a matter of law, there is a fiduciary or quasi-fiduciary relationship between an insurer and an insured in a workers' compensation context. However, our determination that there is no such relationship can be gleaned from the reasoning we have employed in previous insurance cases.

In *Trimble*, we considered the appropriate standard of conduct for insurers in handling third-party claims.[13] 691 P.2d at 1141–42. Relevant to the instant case, we stated that this standard must reflect the "quasi-fiduciary relationship ... between the insurer and the insured by virtue of the insurance contract." *Id.* at 1141. We then explained that our finding of a "quasi-fiduciary" relationship stemmed from the insurer's control over the defense of actions brought against the insured by third parties:

> Particularly when handling claims of third persons that are brought against the insured, an insurance company stands in a position similar to that of a fiduciary. By virtue of the insurance contract, the insurer retains the absolute right to control the defense of actions brought against the insured, and the insured is therefore precluded from interfering with the investigation and negotiation for settlement.

*Id.* (citations omitted). Significantly, we did not find a true fiduciary relationship between the insured and an insurer, but only a "quasi-fiduciary" relationship when handling third-party claims. *See Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo.1996) (stating that the insurer/insured relationship falls short of a true fiduciary relationship, even in the context of defending a third-party law-

---

**13.** A third-party claim means that a third party has made a claim against the insured, and the insurer allegedly has the responsibility to defend the insured against that claim.

suit). Also, as we had explained in *Savio*, even these "quasi-fiduciary" circumstances do not apply in the workers' compensation context.

*Savio* involved a dispute between a workers' compensation claimant and his employer's workers' compensation insurer. 706 P.2d at 1260. Noting that the Workers' Compensation Act requires that every workers' compensation contract contain a clause that the insurer shall be directly and primarily liable to the employee, we held that a covered employee stands in the same position as an insured in a private insurance contract. *Id.* at 1272. Thus, we agreed that a workers' compensation claim should be treated as a first-party direct coverage claim. *Id.* at 1272 n. 18.

▮ Having established that a workers' compensation claim should be treated the same as a first-party claim, we then stated that the relationship between the insurer and the insured in a first-party direct coverage case varies significantly from the relationship that characterizes a third-party claim. *Id.* at 1274. In a first-party direct coverage case, the insured has *not* ceded any right to represent his interests to the insurer. *Id.* The insured can directly influence the insurer's claim evaluation process and may file an action to compel performance by the insurer or seek damages for failure of the insurer to perform. *Id.* In addition, the insurer is afforded wide latitude in its ability to investigate claims and to resist false or unfounded efforts to obtain funds. *Savio*, 706 P.2d at 1274; *Bailey*, 844 P.2d at 1339. Thus, the basis for our finding a quasi-fiduciary relationship in *Trimble*—the insurer's control over the defense of actions brought against the insured by third parties—does not exist in a first-party context. "In a first-party context, where the insured has not ceded to the insurer the right to represent his or her interests, there is no quasi-fiduciary duty." *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 415 (Colo.2004); *see also Bernhard*, 915 P.2d at 1289 (stating that the quasi-fiduciary relationship between an insurer

and an insured is limited to areas in which the insurer exercises a strong degree of control over the insured's interests).

▮ Having previously found that workers' compensation claims should be treated like first-party claims and that there is no fiduciary or quasi-fiduciary relationship between an insured and an insurer in a first-party context, we now explicitly hold that the insured and insurer in a workers' compensation context are not in either a fiduciary or quasi-fiduciary relationship. As in a first-party direct coverage case, a workers' compensation claimant has not ceded any right to represent his interests to the insurer. A workers' compensation claimant can directly influence the insurer's claim evaluation process. A claimant may seek review of an insurer's action as well as penalties under the procedures set forth in the Workers' Compensation Act, and may file a bad faith tort action against the insurer. Similar to a first-party insurer, a workers' compensation insurer may investigate claims and resist false or unfounded efforts to obtain funds. In sum, the elements necessary to establish a fiduciary or quasi-fiduciary relationship do not exist between a worker's compensation insurer and the insured.

Because there is no fiduciary or quasi-fiduciary relationship between an insurer and the insured in the workers' compensation context, we affirm the court of appeals' determination that Petitioner's breach of fiduciary duty claims against Respondents were properly dismissed.

### D. Fraud Claim

Petitioner claims that the letter dated August 20, 1999, from Interstate's counsel denying authorization for the WhinRho treatment was a factual misrepresentation that constitutes fraud. This allegation is based on Colorado's Workers' Compensation Regulations that state that if an insurer does not issue a written denial of a requested treatment along with certain supporting information within five business days, the request will be "deemed authoriz[ed]." [14] Because the Au-

---

**14.** 7 Colo.Code Regs. § 1101–3 (1999), subsections XVI(I) and (J), now subsections 16–9 and 16–10.

gust 20, 1999 letter was sent after this five-day period and did not contain the supporting information, Petitioner argues that the treatment was deemed authorized, and that Respondents sent the letter stating authorization was denied even though they knew that the treatment was deemed approved. As a result of this letter, Brodeur's doctors withheld both the WhinRho treatment and the back surgery that was dependent on the WhinRho · treatment. Thus, Petitioner argues that the August 20, 1999 letter contained a misrepresentation of a material fact by Respondents. Alternatively, Petitioner claims that even if the letter was a legal opinion, it qualifies for the exception to the legal opinion rule for fraud claims.

Respondents argue that the letter was a legal opinion not subject to a fraud claim. The court of appeals agreed with Respondents and the trial court that the letter was a misrepresentation of law, not of fact, and that it did not qualify for the exception to the rule that legal opinions are not actionable. *Brodeur*, No. 03CA1710, slip op. at 26–29. We affirm that the letter was not a misrepresentation of fact, and that it does not qualify for any exception to the general rule requiring this element for an actionable fraud claim.

 A misrepresentation, which is a false or misleading statement that induces the recipient to act or refrain from acting, is actionable when it is made "either· with knowledge of its untruth, or recklessly and willfully . . . without regard to its consequences, and with an intent to mislead and deceive the plaintiff." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142, 147 (Colo.2003) (quoting *Parks v. Bucy,* 72 Colo. 414, 418, 211 P. 638, 639 (1922)). To be actionable as fraud, a misrepresentation must be of an existing or past material fact. *United Fire & Cas. Co. v. Nissan Motor Corp.,* 164 Colo. 42, 45, 433 P.2d 769, 771 (1967) (citations omitted). In contrast, a representation of law is a statement of opinion as to what the law permits or prohibits, and cannot support an action for fraud. *Chacon v. Scavo,* 145 Colo. 222, 223, 358 P.2d 614, 614 (1960); *Metzger v. Baker,* 93 Colo. 165, 167, 24 P.2d 748, 749 (1933). As

a mere statement of opinion, a representation of law may be correct or incorrect. See *Metzger,* 93 Colo. at 167, 24 P.2d at 749 ("The truth or· falsehood of ·[a] representation [of law] can be tested by ordinary vigilance and attention.")

 A statement concerning the law is a misrepresentation of fact if it involves "statements that imply the existence of accurate and readily ascertainable facts that either concern the law or have legal significance, but which are not part of the law themselves." *Equal Justice Found. v. Deutsche Bank Trust Co. Am.,* 412 F.Supp.2d 790, 795–96 (S.D.Ohio 2005); see also *Kunz v. Warren,* 725 P.2d 794, 797 (Colo.App.1986) (holding that a broker's representation that real estate was an existing subdivision and lots were ready for sale while he knew the subdivision was only conditionally approved could support misrepresentation of fact). In contrast, misrepresentation of law concerns "the legal meaning and effect of a statute, ruling, . . . or other source of law." *Equal Justice Found.,* 412 F.Supp.2d at 795–96; see also *Metzger,* 93 Colo. at 167, 24 P.2d at 749 (holding that whether an ordinance existed and what it provided was a representation of law).

 Respondents' August 20, 1999 letter did not contain a "misrepresentation of fact" as necessary to support Petitioner's fraud claim. The letter stated that Respondents "denied authorization for [the WhinRho treatment]." The direct statement in the letter that Respondents would not authorize the treatment was a true statement of Respondents' action and not the basis of the claimed misrepresentation. Rather, the misrepresentation arose from the implication that the WhinRho treatment had not already been authorized—an incorrect representation of a matter of law. The misrepresentation that the treatment had not been authorized is an incorrect opinion of the legal meaning and effect of the regulations. Thus, the denial of the WhinRho treatment was a misrepresentation of law, not a misrepresentation of fact. Although eventually the ALJ determined that Respondents erroneously denied the WhinRho treatment, the ALJ's decision did not retrospectively change Respondents' in-

correct legal opinion into a misrepresentation of a fact. As a statement of Respondents' opinion on a matter of law, the denial in the August 1999 letter is not actionable under the general rule that requires a misrepresentation of fact.

The general rule that statements of a legal opinion are not actionable is subject to certain exceptions. *See, e.g., id.* (noting the exceptions of special knowledge, a fiduciary relationship, and representations as to the law of a foreign state). Petitioner argues in the alternative that two exceptions apply in this case: (1) the superior knowledge exception, and (2) the relationship of trust and confidence exception.

██ A statement as to the legal effect of a document may constitute a false representation if it is intentionally false or ·is made with reckless disregard for its truth or falsity, and the declarant has special or superior knowledge about the law and such knowledge is not reasonably available to the person to whom the statement is made. *Boyles Bros. Drilling Co. v. Orion Indus., Ltd.,* 761 P.2d 278, 282 (Colo.App.1988) (citing *Pattridge v. Youmans,* 107 Colo. 122, 109 P.2d 646 (1941)); *see also Seal ·v. Hart,* 755 P.2d 462, 464 (Colo.App.1988) (stating the exception for superior knowledge exists "where the party making the misrepresentation has or professes to have superior knowledge which is not reasonably available to the person to whom the representation is made").

██ The facts of the instant case do not support the application of this special or superior knowledge exception. This exception is generally applicable where there is an agreement between two parties, and one of the parties, who possesses special or superior knowledge, opines on an issue that is material to the agreement between the parties. For example, *Boyles* involved a contract agreed to by an attorney and a layman. 761 P.2d at 282. The statement at issue was a legal opinion given by the attorney to the layman. *Id. Seal* involved an action on a promissory note securing the purchase of property. 755 P.2d at 464. The statement at issue was a representation allegedly given

by the sellers to the buyers. *Id.* at 463. Thus, this exception requires the party making the statement to possess superior or special knowledge that was not present in the case before us. Legal counsel was available to Brodeur throughout his workers' compensation proceeding; there are no facts to support an allegation that Respondents possessed any special or superior knowledge regarding the legal issues surrounding denial or approval of the WhinRho treatment. Therefore, this exception does not apply here.

██ The relationship exception to the general rule that statements of a legal opinion are not actionable is also not applicable. According to our decisions in *Metzger* and *Parks,* this exception may apply if: (1) the parties are in a fiduciary relationship; (2) the party making the statement is a lawyer and the circumstances require him to divulge all the information that he had to the plaintiff; or (3) the party making the statement is a lawyer and knew that the plaintiff was relying upon him as one learned in the law. *See Metzger,* 93 Colo. at 167, 24 P.2d at 749 (noting fiduciary relationship exception); *Parks,* 72 Colo. at 419, 211 P. at 639. However, Petitioner relies on *Seal,* in which the court of appeals recharacterized this exception as "where the parties are in a confidential or trust relationship." 755 P.2d at 464 (citing *Chacon,* 145 Colo. 222, 358 P.2d 614; *Metzger,* 93 Colo. 165, 24 P.2d 748; *Parks,* 72 Colo. 414, 211 P. 638). The cases upon which *Seal* relied do not describe the exception as a "confidential or trust" relationship, but only as we have set forth above. Further, the court in *Seal* does not explain if by using the phrase "confidential or trust relationship" it was referring to anything other than the relationships described in *Metzger* and *Parks;* instead, the analysis in *Seal* centered on the possibility of superior knowledge or a dual agency relationship. Thus, we apply the narrow definition of the relationship exception as set forth in *Metzger* and *Parks,* and decline to analyze or apply a broader exception of "confidence and trust" as urged by Petitioner.[15]

---

15. In *Bailey,* the court of appeals also stated that

there is a "relationship of confidence and trust

The type of relationship necessary to support the relationship exception did not exist between Brodeur and Respondents. As we explained in the previous section, Respondents were not in a fiduciary relationship with Brodeur. Further, Respondents had no obligation to divulge to Brodeur all of the legal information they possessed regarding their denial of the WhinRho treatment, and Respondents would not have thought Petitioner was relying on them to give an accurate legal opinion with respect to their response to the request for the WhinRho treatment. Thus, Respondents and Brodeur did not have the requisite relationship to apply this exception.

Because none of the exceptions are applicable, we affirm the court of appeals' determination that Petitioner's fraud claims are not actionable, as the statement involved was an opinion of law and not misrepresentation of a fact.

### E. Public Impact Under the CCPA

■ To prove a private claim for relief under the CCPA, a plaintiff must show that: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Crowe v. Tull,* 126 P.3d 196, 201 (Colo.2006) (citing *Rhino Linings,* 62 P.3d at 146–47). In *Showpiece Homes Corp. v. Assurance Co. of America,* we determined that the CCPA applies to the insurance industry. 38 P.3d 47, 49 (Colo.2001).

■ The question before us is whether the public nature of the workers' compensation insurance program is sufficient to satisfy the "public impact" element. The court of appeals remanded Petitioner's CCPA claims,

finding that the trial court did not permit adequate discovery of Respondents' internal claim processing practices that may have allowed Petitioner to show an impact on the public. Petitioner argues that she does not need to show specific "public impact" because the public nature of workers' compensation insurance satisfies per se the public impact element of a CCPA claim, and that significant public impact is inherent in Respondents' workers' compensation practices. We hold that the public nature of the workers' compensation program is not sufficient to constitute per se public impact under the CCPA. Further, we find no public impact inherent in Respondents' workers' compensation practices.

■ Our cases outline relevant considerations to determine whether a challenged practice significantly impacts the public within the context of a CCPA claim. These considerations include (1) the number of consumers directly affected by the challenged practice; (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice; and (3) evidence that the challenged practice has previously impacted other consumers or has significant potential to do so in the future. *Rhino Linings,* 62 P.3d at 149 (citing *Martinez v. Lewis,* 969 P.2d 213, 222 (Colo.1998)). Conversely, if a wrong is private in nature and does not affect the public, a claim is not actionable under the CCPA. *Id.; see also U.S. Welding, Inc. v. Burroughs Corp.,* 615 F.Supp. 554, 555 (D.Colo.1985) ("[T]he [CCPA] is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong.").

■ We have never found that the public nature of a particular business satisfies per se the public impact element of a CCPA claim. Under the CCPA, it is not enough that the defendant's industry affects the public interest. Adopting an interpretation that the public impact element of the CCPA could

which exists between the insurer and insured." 844 P.2d at 1339. However, from the context, it is obvious that in this instance the court was referring to the quasi-fiduciary relationship between the insurer and insured that we described

in *Trimble.* As we discussed in the previous section, even if this quasi-fiduciary relationship does give rise to the relationship exception for statements of a legal opinion, no quasi-fiduciary relationship exists here.

be satisfied simply if the defendant's industry "affects the public interest" would render this requirement and our discussion of the public impact considerations in *Rhino Linings* meaningless. As we have emphasized before, to constitute the public impact contemplated by the CCPA, the challenged *practice* must significantly impact the public. *See Crowe*, 126 P.3d at 204 ("The crux of a CCPA claim is a deceptive trade practice, which, by definition, must be intentionally inflicted on the consumer public."); *Hall v. Walter*, 969 P.2d 224, 234 (Colo.1998) ("The CCPA regulates practices which because of their nature, may prove injurious, offensive, or dangerous to the public.") (citations omitted). Although the public nature of the business may be a factor to consider when determining if the challenged practice affects the public, it is not enough, standing alone, to satisfy the public impact element of the CCPA.

Further, we see no unique aspect of the workers' compensation program that requires us to adopt a per se rule in this circumstance. Although the workers' compensation program is statutorily prescribed, the fact that a workers' compensation insurer and an insured have a dispute over a claim does not necessarily mean that other members of the public are or have been affected by the insurer's practices. The practice complained of by the insured may be an individualized response to that insured's claim.

Finally, the scant facts in the record before us do not demonstrate whether Respondents have engaged in deceptive trade practices in the handling of workers' compensation claims in a manner that "significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property." The nature and scope of Respondents' business and its use of public forums do not automatically or presumptively create the necessary public impact. Considering the factors set forth in *Rhino Linings*, we do not have sufficient information regarding the number of consumers directly affected by the challenged practice, the relative sophistication and bargaining power of the consumers affected by the challenged practice, or evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

Because nothing inherent in the nature of a workers' compensation claim or Respondents' business supports a finding of public impact, we affirm the court of appeals' decision remanding Petitioner's CCPA claims for further proceedings, including discovery.

## IV. Conclusion

We hold that the determination of when a bad faith tort claim accrues is dependent only on section 13–80–108(1), even when the claim stems from an ongoing workers' compensation proceeding. We hold that a workers' compensation proceeding and a bad faith tort action are not part of the same case; therefore, the law of the case doctrine is inapplicable between the two claims. Further, we find that the statute of limitations bars Petitioner's bad faith tort claims and that her claims were not equitably tolled by the workers' compensation proceeding.

We hold that there is no fiduciary or quasi-fiduciary relationship between a workers' compensation insurer and an insured. As a result, Petitioner's breach of fiduciary duty claims against Respondents are not actionable.

We find that Respondents' denial of workers' compensation treatment was a statement of a legal opinion, not a misrepresentation of fact, and that it did not meet any of the exceptions to the general rule that legal opinions are not actionable. Thus, there was no basis for Petitioner's fraud claim.

Finally, we hold that the public nature of the workers' compensation program does not automatically satisfy the public impact necessary to sustain a CCPA claim. As to Petitioner's particular claim, the record before us is insufficient to support a finding that the required public impact element has been met. However, we agree with the court of appeals that the CCPA claims should be remanded for further proceedings, including discovery.

We affirm the judgment of the court of appeals.

Chief Justice MULLARKEY concurs in part and dissents in part, and Justice HOBBS joins in the concurrence and dissent.

MULLARKEY, C.J., concurring in part and dissenting in part.

I respectfully dissent from Part III.D of the majority's opinion and its judgment affirming the court of appeals' conclusion that Petitioner's fraud claims are not actionable. Because nothing in the Respondents' letter denying authorization for the WhinRho treatment indicates that the misrepresentations at issue are necessarily ones of law, I would hold that the statements in the denial letter were factual misrepresentations and would remand this case for further consideration of the fraud claim.

Petitioner's fraud claim centers on a letter sent by Respondents' counsel on August 20, 1999, to Dr. Ribovich, denying authorization for Dr. Diab's recommended WhinRho drug treatment. The court of appeals determined that on the basis of this denial, Brodeur's health care providers refrained from administering treatment or performing back surgery. *Brodeur v. Am. Home Assurance Co.*, No. 03CA1710, slip op. at 3, 2006 WL 488731 (Colo.App. Mar.2, 2006). The letter at issue asserted that the treatment was denied because Brodeur's blood condition was "not related to his industrial injury." In addition, the letter noted that the back surgery was "elective in nature."

Petitioner argues that this letter constitutes fraud because, by the time the letter was sent, the treatment had already been "deemed authoriz[ed]" pursuant to the Colorado Workers' Compensation Regulations. The relevant regulation provides that a request for treatment will be deemed authorized if an insurer does not issue a written denial of the request, along with supporting information, within five business days.[1] Here, the denial letter was sent after the five-day period; thus, the treatment was deemed authorized. On this basis, Petitioner contends that the statements of denial in the August 20, 1999 letter were misrepresenta-

tions of material fact, upon which Brodeur and his doctors relied in refraining from both the WhinRho treatment and the back surgery. I agree.

As the majority noted, a misrepresentation is "actionable when it is made 'either with knowledge of its untruth, or recklessly and willfully ... without regard to its consequences, and with an intent to mislead and deceive the plaintiff.'" *See Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo.2003) (*quoting Parks v. Bucy*, 72 Colo. 414, 418, 211 P. 638, 639 (1922)). To serve as the basis for fraud, a misrepresentation must be of a material existing fact. *See Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1361 (Colo.1993) (stating elements of fraud claim). In contrast, a misrepresentation of law is a "mere expression of opinion," and it cannot support an action for fraud. *Metzger v. Baker*, 93 Colo. 165, 167, 24 P.2d 748, 749 (1933).

Here, the denial letter was written by the insurer's counsel, who presumably is well-versed in workers' compensation law. The insurer undoubtedly sends countless letters of denial and authorization each year. Its counsel would be knowledgeable of the regulatory five-day time period. Counsel knew or should have known that the insurer's failure to send a letter within the five-day period would result in the requested treatment being deemed authorized, and therefore, knew or should have known that its subsequent letter denying authorization was false.

The majority rejects Petitioner's argument, and instead affirms the court of appeals' determination that the statements are inactionable misrepresentations of law, not fact. Here, however, the August 20, 1999 letter was not a mere expression of Respondents' opinion. The letter included no statements about what the law would permit; rather, it was a blanket statement that the insurer would not pay for treatment. This was not a legal principle up for discussion or debate. Like most workers' compensation claimants, Brodeur was in no position to dic-

---

**1.** 7 Colo.Code Regs. § 1101–3 (1999), subsections XVI(I) and (J), now subsections 16–9 and 16–10.

tate terms to the insurer, or propose varying interpretations of legal principles.

The statements made in this case are analogous in nature to those misrepresentations of fact found in *Kunz v. Warren,* 725 P.2d 794 (Colo.App.1986). In *Kunz,* the plaintiff alleged that the defendants committed fraud when they sold him property, claiming it was "an existing subdivision, ready to be sold as lots" when the property was actually only conditionally approved and still required the installation of improvements. *Id.* at 796. One of the defendants argued that the misrepresentations were legal in nature and thus, could not support a fraud claim. *Id.* He asked the court to follow the holding of *Chacon v. Scavo,* 145 Colo. 222, 358 P.2d 614 (1960), where this court found that representations regarding whether certain lots were usable as building sites required an interpretation of the pertinent city ordinances and thus, were legal misrepresentations. *Kunz,* 725 P.2d at 796. The *Kunz* court, however, distinguished *Chacon* on its facts, and held the statements concerning the ability to sell the property as lots to be representations of fact. *Id.* at 797. The court noted that the statements involved the "existing status" of the subdivision, and were "not based on an interpretation of the applicability of existing zoning law." *Id.*

In this case, the August 20, 1999 letter contained statements regarding the status of Brodeur's request for authorization. Denial of authorization on the grounds that the blood condition was not related to Brodeur's industrial injury did not require an interpretation of the applicability of existing workers' compensation law. The letter was false because the treatment had already been automatically authorized pursuant to the applicable regulation. The plain language of the statements themselves constitutes a misrepresentation of fact. *See Mehaffy, Rider, Windholz & Wilson v. Cent. Bank,* 892 P.2d 230, 237 (Colo.1995) (holding that attorney opinion letters are "mixed statements of law and fact that might constitute misrepresentations of material fact" on which liability could be based). Respondents here were essentially saying, "We will not pay," not "Our legal position is that we are not required to pay

for treatment." The denial was a misrepresentation of fact and as such, Petitioner should have been able to assert her fraud claim.

The fact that the ALJ ultimately determined that Respondents inappropriately denied the WhinRho treatment does not negate the damage already done by Respondents' initial misrepresentations. Brodeur did not receive the drug treatment and did not undergo back surgery, due to his doctors' reliance on Respondents' statements in the August 20, 1999 denial letter. For these reasons, I would find that the statements at issue were misrepresentations of fact, and would allow Petitioner to pursue her fraud claim. Accordingly, I respectfully dissent from Part III.D of the majority opinion and join in the remainder of the opinion.

I am authorized to state that Justice HOBBS joins in this concurrence and dissent.